# Richmond

WILLIAM C. ROWLAND V. WILLIAM H. KABLE AND OTHERS.

January 8, 1940.

Record No. 2117.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

348

*John D. White, Christian, Barton & Parker* and *A. C. Epps,* for the appellant.

*S. D. Timberlake, III,* for the appellees.

SPRATLEY, J., delivered the opinion of the court.

This case, involving the management of a trust estate, presents, in many of its aspects, a story that comes too frequently before the courts. The circumstances are so varied and complicated that we have not been cited to any reported case similar in all respects. The facts are so important to a correct decision as to warrant setting them out in extensive detail.

William H. Kable purchased, about the year 1894, all of the capital stock of the Staunton Military Academy, Incorporated, a corporation, which owned and operated a school known as the Staunton Military Academy.

William G. Kable, hereinafter referred to as Colonel Kable, the son of William H. Kable, acquired all of this stock from his father in 1906, becoming president of the corporation and principal of the school in 1913, and continuing in each position until his death in July, 1920.

William C. Rowland, who was a salesman for a manufacturer of military uniforms, had, through his business relations, formed a friendship with the Kables, father and son. Rowland went into business in his own name in 1905, in Philadelphia, and in that year obtained for himself an order for uniforms from William H. Kable.

In 1904, Thomas H. Russell, who had been teaching at another military academy, was secured as headmaster of Staunton Military Academy. At other military institutions where Russell had been employed as an instructor, he had represented uniform manufacturers, and, under arrangements with those institutions, had been permitted to receive a commission on the sale of uniforms to those institutions to augment his salary. The Kables, father and son, agreed that he might continue to receive commissions on sales of uniforms to the school at Staunton, in addition to his salary, which salary they desired to keep as small as possible for the effect on other employees of the school. This agreement was one of the inducements to bring him to Staunton. Rowland having proven to the Kables that

he could satisfactorily supply the school with uniforms, an agreement was made, in writing, between Rowland, Russell and the Kables, that Rowland would pay to Russell a commission of 6% for all equipment sold by him to the school, in return for which Russell was to supervise the measurements of the uniforms, receive and distribute them, and in case of alterations, note the defects, and return the goods for alterations or changes, thereby saving the cost to Rowland of sending another representative for such work.

Rowland furnished practically all of the uniform equipment to the school from 1905 until William G. Kable's death in 1920, paying during that period a 6% commission on the gross sales to Russell, with the knowledge and approval of the Kables, during their respective ownership of the school corporation. While this arrangement was not specifically known to other employees of the school, it was known to Mrs. William G. Kable, Mrs. T. H. Russell and to Gilpin Willson, who had been continuously a director of the corporation from the year 1895. Rowland and Willson agreed that Colonel Kable was so satisfied with the servicing of the school with uniforms by Rowland that he had expressed himself as wanting Rowland to furnish uniforms to the school always. Rowland claims that William H. Steele, who had come to the school as a bookkeeper in 1909, and who subsequently occupied more important relations with the school, was also cognizant of the agreement. This Steele denies.

In 1910, Russell married Eleanor Kable, the daughter of William H. Kable, and the sister of William G. Kable.

The Kables, Russell and Rowland became most friendly and intimate, paying numerous visits to the homes of each other, and expressed in their written correspondence the utmost confidence in each other. W. G. Kable, in fact, lent $10,000 to Rowland to enable the latter to purchase the interest of a partner, and establish a business in his sole name. Thereafter, no uniforms were purchased except from Rowland, the only check on the purchases being that

which the Kables or Russell kept on the prices charged as compared with other manufacturers.

William G. Kable died on July 4, 1920, testate. He left surviving him a widow, Eleanor E. Kable (now Mrs. Whitehead) and three children, namely, Eleanor H. Kable (now Eleanor Kable Miller), born July 10, 1911, William H. Kable, born June 4, 1912, and Helene H. Kable, born August 19, 1914.

In his will, Kable appointed Thomas H. Russell, Gilpin Willson, and W. C. Rowland, his trusted friends, as the executors of his estate. He named his widow, Eleanor E. Kable, his brother-in-law, Thomas H. Russell, Gilpin Willson, W. C. Rowland and W. H. Steele, as testamentary trustees for all the capital stock of Staunton Military Academy, Incorporated. These five trustees were directed to continue the operation of the school, and, to that end, to vote the stock, with the power to elect themselves, if they saw fit to do so, as officers and directors of the corporation; and to employ Russell as principal of the Academy, so long as he lived, or desired such employment, and conducted himself and the affairs of said office in a proper manner, at a reasonable salary not to exceed $10,000 a year. The trustees were vested with wide discretion and were cautioned to avoid any unbusinesslike ventures, or unreasonable expenditures, and to seek always the welfare of the school and an increase in its profits; and to pay all taxes and expenses, including the sum of $200 each year to each trustee.

The net income coming into the hands of the trustees from the operation of the school and the management of the trust was directed to be paid over to the widow during her natural life, or until some one of the children should attain the age of twenty-one years, as the death of the widow or the coming of age of some one of the children should first occur. Payments of the income were to be made at least annually, but partial payments during the year were also permitted by way of advancement in the event the trustees had on hand sufficient funds to enable

them to make such payments. As each child came of age, he or she was to receive a one-ninth part of the income. Upon the death of the widow, the trustees were directed to hold the trust estate for the benefit of the testator's children, or the child of such of his children as might be then dead, *per stirpes*, or until all should have attained the age of twenty-five, if male, and twenty-two, if female, when the estate should be delivered to the said children. Other provisions of the will are not concerned in the issues here presented.

The accounts of the executors have been settled and approved, and as there is no charge of breach of executorial duty, we are not concerned here with the transactions of the executors as such.

After the probate of the will, the testamentary trustees, pursuant to the provisions of the will, met on July 14, 1920, and elected as directors of Staunton Military Academy, Incorporated, Gilpin Willson, Thomas H. Russell, W. H. Steele, W. C. Rowland and T. G. Russell. Thomas H. Russell, who had formerly been vice-president, during the life of Kable, was elected president, Willson, vice-president, and Steele, treasurer. An executive committee, consisting of Willson, Thomas H. Russell and Steele, was appointed, vested with all the power of the board of directors between meetings of the board.

Thomas H. Russell was greatly disappointed when he learned that his brother-in-law, Colonel Kable, had failed to further recognize his long service to the school and his intimate relations with the testator by making some provision in his will, whereby he, Russell, could acquire ownership and control of the school. However, after the reorganization of the board and the grant of an increase in his salary for his enlarged duties and responsibilities, he continued as president of the corporation until his death. As the managing executive head of the corporation, he was in complete control of all of the departments and activities of the school, using the title of superintendent, the usual title for the head of a military school.

On July 10, 1923, Mrs. Kable was elected a director in T. G. Russell's place. The same persons continued as trustees until 1933. Dr. L. J. Whitehead, whom Mrs. Kable had married in 1927, was elected to the board. Dr. Whitehead declined reëlection in 1934, and William A. Pratt was elected in his place. In 1936, Steele was not reëlected. The board consisted of only four directors until Pratt's death in 1937.

At the stockholders' meeting in 1937, following the appointment of S. D. Timberlake, Jr., as testamentary trustee in the place of Pratt, a new board was elected, which has since consisted of Mrs. Whitehead, S. D. Timberlake, Jr., Steele, L. W. H. Peyton and H. McKay Smith.

In 1920, a friendly suit was instituted, in the Corporation Court of the city of Staunton, by the executors against the trustees, legatees and devisees under the will of William G. Kable, for the guidance of the court in the administration of the estate. In this suit, application was made from time to time for permission to do certain things, and for the approval by the court of certain actions taken by the executors, trustees and directors. Included in the actions approved was an immediate increase in the salary of Thomas H. Russell from $6,000 to $10,000 a year, permission granted for the payment of dividends, permission to advance moneys on dividends to meet Mrs. Kable's needs, permission to use the profits of the school to make improvements therefor, and the payment of $2,500 per year to each of the three members of the executive committee.

At the time of the death of William G. Kable, during the period of an economic depression, the school's cash balance was low, and it was necessary to borrow money for temporary relief. At Kable's death, his estate and the corporation owning the Academy were subject to direct and contingent liabilities in a sum exceeding $362,000. By good business judgment and management, the contingent liabilities were removed. All moneys borrowed and debts outstanding were repaid, and under the new regime the school began a period of prosperity.

In the period from 1920 to 1932, during the minority of the Kable children, a total of $191,000 was paid in dividends to Mrs. Kable (Whitehead) for the support of herself and children, $409,000 was expended on improvements and betterments, and a surplus of $72,000 was accumulated and set aside for the future needs of the school.

The books of the school further disclose that its sales of uniforms, stationery and other items produced $336,017.68 in excess of costs thereof from June 1921 to June 1936. Of this profit much the greater amount came from the sale of uniforms.

Mrs. Kable, with her three children, remained in Staunton two years after her husband's death, and then removed to Greenwich, Connecticut, and later to Richmond, Virginia. She paid little attention to the administration of the Academy during the first years, although she was in correspondence with Rowland and conferred with Willson, with both of whom she was on terms of friendship. She received the various reports of the officers of the school, and fairly regularly attended the meetings of the board of directors. Willson lived in Staunton, where he was engaged in the drug business, and Rowland lived in Philadelphia, where he conducted his business as a manufacturer of uniforms. Together with Steele, all of these parties were on most intimate and friendly terms, expressing their highest regard for the motives and integrity each of the other, until the happenings of the events herein subsequently related. Each of them was held in high respect for honesty and integrity in the communities in which he lived.

The arrangements respecting the sale of uniforms by Rowland to the school, which had existed during Kable's life, were continued thereafter. The school, through Russell, purchased the uniforms and equipment from Rowland, or W. C. Rowland, Inc. Russell was paid a commission of 6% on the amount of the purchases. The uniforms were sold directly by the school to its students. No competitive bids were asked for or received until after the death of Russell in 1933.

No formal action regarding the price or the purchase of uniforms is shown in the record of the board of directors or of the executive committee, although there is mention of the price of other supplies. Nor is there any record of approval by court action. There is a conflict as to whether all members of the board knew that commissions on sales were being paid to Russell after Kable's death. Willson testified that he had known of the contract with Russell since 1910, when Kable had told him of it and of his desire for Rowland to have it always; that he had taken up the "proposition" with the trustees, the board of directors, and with Judge Kerr of the Corporation Court of the city of Staunton; and that the contract had been approved with the knowledge of Mrs. Whitehead, Steele, T. H. Russell and himself. Rowland says the matter was often discussed in the presence of Steele at meetings of the board of directors, and that he, Rowland, had also informed Judge Kerr of the facts. Judge Kerr died before the issues herein were raised. Mrs. Whitehead testifies that she did not know of the continued payment of the commissions to Russell until after this suit was brought. Steele admits that he had heard rumors of the commissions being paid, but had no definite knowledge thereof until informed by Rowland in 1932. None of the children of Kable came of age until 1932, and it does not appear when they first had notice. They did not testify in these proceedings.

A substantial profit was made by the school in the sale of uniforms, military equipment and supplies to its students. In fact, this profit was a material part of the income of the school. The price of the uniforms and military equipment was fixed in the catalogue of the school preceding the fall session, and was included as a part of the expenses of a student. The equipment bore a fixed price to the students in advance, and if the cost to the school increased, the quantity of the equipment furnished the students was decreased to make up for the difference.

Rowland, as an individual, sold the equipment during the session 1921-22. In 1923, he organized William C. Row-

land, Inc., which corporation thereafter sold the equipment and paid the commissions to Russell. Rowland was the sole owner of the corporate stock of his corporation. Records show that some articles were sold at lower prices than were charged other schools, and some at higher prices. This is undertaken to be explained by the statement that the cost depended upon the material and workmanship. As an added service, and without cost to the school, Rowland or Rowland, Inc. each year sent their tailors from Philadelphia to Staunton, who made the necessary measurements and alterations in uniforms to fit the students.

The health of T. H. Russell began to fail in 1929, and he died on July 4, 1933. After the death of Kable in 1920, Russell's duties became heavier, and he apparently gave less and less supervision to the performance of his contract for the supervision of the sale and measurement of uniforms purchased from Rowland. There is a conflict as to the measure of such duties performed, but, in any event, they became so small that, finally in 1933, Rowland stated that he thought the 6% should be abandoned, and it was abandoned that year.

Before William G. Kable's death, and continuing until 1933, members of the school's administration, including T. H. Russell and Steele, operated a canteen on the school property. In 1933, Rowland raised some question as to the propriety of the above arrangement, and thereafter the profits from the canteen were turned over to the school. This deprived the former participants and owners of the canteen of an income which was substantial at times.

Prior to this time, Russell, Steele and Rowland began a correspondence with reference to the school buying all of the equipment from Rowland, Inc., without competitive bids. As a result of the agitation on this subject and of the economic depression in 1930, prices for uniforms were reduced 3% for that year. The reductions were continued until they reached a maximum of 20% for 1933.

Friction over these matters arose between Rowland and Steele and gradually increased. Other members of the

board joined with Rowland, and Steele was not reëlected in 1936. He was reëlected in 1937, when the present board took control. Rowland then resigned as a director. He refused to resign as a testamentary trustee, under threat that this suit would be instituted if he declined to resign.

On June 4, 1937, William H. Kable and Eleanor K. Miller, who had become of age, respectively, on July 10, 1932 and on June 4, 1933, by leave of court, filed, in the original chancery suit of 1920, for the administration of the estate, a petition on their own behalf and for the use and benefit of their co-beneficiaries and the Staunton Military Academy, Inc., against William C. Rowland. This was three and one-half years after the death of T. H. Russell. Mrs. Eleanor E. Kable (Mrs. Whitehead) did not join in the petition. She was, however, a party to the original suit, as were the testamentary trustees and directors who had repeatedly asked therein for the aid, guidance and approval of the court in their transactions with the trust estate.

The petitioners alleged that they had only recently learned that Rowland had unlawfully divided his profits with T. H. Russell each year, and that he had paid to Russell a sum approximating $70,000. They prayed for the removal of Rowland as testamentary trustee, and for an accounting from him of all profits derived by him from his dealing with the school corporation, since the death of William G. Kable, including such part of the profits as he had paid to Russell.

The Staunton Military Academy, Inc., on the 30th day of June, 1937, filed its petition adopting the allegations in the petition of the two children, and prayed for a complete inquiry into the whole matter, and for the return to it of all profits which should appear to have been wrongfully received by William C. Rowland, or William C. Rowland, Inc., and for the return to it of all money paid by Rowland or his corporation to Russell, in connection with the sale of uniforms and other supplies.

Each of the petitioners alleged gross misconduct on the part of Rowland in that he had dealt with his trust estate

for his own profit, and had received large sums of money far in excess of the value of the goods which he supplied to the trust estate, aided by collusion between himself and Russell.

William C. Rowland, Inc., was not a party to the original suit, nor was it made a party to either proceeding by petition.

Rowland filed a demurrer and answer to the petition of the children. For grounds of demurrer, he denied that the petitioners had a right to the monetary relief as beneficiaries, since they were not stockholders of the said corporation, and did not show that the said corporation had been requested and had refused to proceed against the defendant; that the petition was multifarious in·that it implicated the defendant in several capacities, in which capacities the duties were not related but were owed to diverse parties; and that they had omitted a necessary party to the relief prayed for in failing to include the personal representative of Thomas H. Russell, deceased.

In his answer, Rowland alleged that all of his duties with the trust estate were fair, open and aboveboard, and known to all the parties in interest. He denied every charge of fraud, collusion and unfair dealing, either as testamentary trustee or as a director of the Staunton Military Academy. He admitted that he had sold the uniforms and military supplies to the school, with Russell acting on behalf of the school, and that he paid to Russell large sums of money as a commission on the volume of the sales.

Rowland further answered that all of the members of the board and of the executive committee and Mrs. Whitehead knew of the continuance of the payments of commissions to Russell after Kable's death in 1920 and acquiesced in it; that the payment of said commissions were for services rendered by Russell in connection with the supervision of the sale of the uniforms and supplies to the school; that the goods were sold at fair and reasonable prices; that the school made a large profit on the resale of the goods to its students; and that Russell was so valuable to the school

that it was to its best interest to permit him to receive the commissions in order to keep him from accepting employment elsewhere.

In his demurrer to the petition of the Academy, he denied the right of the Academy to file its petition, on the grounds that it was not a beneficiary of the trust; that there was no privity between the defendant as director of the said corporation or said corporation and the beneficiaries of the trust; and that if the corporation was entitled to an accounting, it must be the subject of an independent suit. For an answer to the latter petition, he adopted and relied on his answer to the petition filed by the children.

Counsel for the plaintiff in error admit in oral argument here that they did not insist upon the demurrers in the court below because they were confident that their client would be exonerated on the merits. They, however, in view of the adverse ruling of the trial court on the merits, now rely upon the demurrers, and further assign error to the ruling of the trial court on the merits.

On August 23, 1938, the trial court entered its decree holding that William C. Rowland was guilty of a breach of fiduciary trust in making the sales shown in the record to the Staunton Military Academy, Inc., and in paying to his co-fiduciary, Thomas H. Russell, commissions upon said sales; that William C. Rowland was liable to account to the Staunton Military Academy, Inc., for profits, as therein set forth, derived by him from his transactions with the said corporation during the period beginning July 5, 1920, and continuing until May 26, 1933; and that William C. Rowland be removed from his position as testamentary trustee under the will of William G. Kable, deceased.

The decree adjudged that all the commissions paid to Thomas H. Russell by Rowland, or William C. Rowland, Inc., during the period aforesaid on goods sold to the school, should be considered as fixed profits, since they were improperly included in the price charged to the school; and that the remaining profits to be accounted for should be determined by ascertaining the price paid each year by the

school to Rowland or William C. Rowland, Inc. for goods sold to it for that year, and deducting therefrom both the said commissions paid to Russell on sales for that year (already allowed) and the fair market value of said goods. Rowland was thus required to account for all the commissions allowed and, in addition, for all profits represented by the difference between the gross sales, less such commissions, and the fair market value of the goods. In fixing fair market value, the reasonable cost of the goods, all necessary and proper handling charges and the usual percentage of profit prevailing in the trade were to be considered, thus fixing such value at the price the goods could have brought on a fair competitive market. Compound interest was allowed on the commissions paid to Russell and simple interest on the residue of the profits. The cause was referred to a commissioner in chancery to ascertain and report the account, as aforesaid, with the burden of proof resting upon Rowland.

Rowland contends that the lower court erred in not sustaining his demurrers; in finding him guilty of a breach of his fiduciary duty, and removing him as a trustee; in adjudging him liable for any moneys paid by himself or William C. Rowland, Inc., to Russell, or for any profits made on his goods sold to the school; in the methods of the accounting; and in decreeing as to any transaction between the parties and William C. Rowland, Inc., the said corporation not being a party to the proceeding.

The appellees assign, as cross-error, the action of the lower court in prescribing the method of accounting for profits, so as to permit Rowland to retain a reasonable profit, the difference between the price paid by the school for the goods less 6%, and the fair market value, instead of requiring him to account for all profits.

We do not deem it necessary to enter into any extensive discussion of the grounds of the demurrers. We do not believe that strict technical grounds of defense should be permitted to obstruct this proceeding, since complete and equitable relief may be had herein.

■ The answer to the first ground of demurrer is that the circumstances justify the right of the Kable children to file their petition, since the record discloses that there was little possibility that it would have been instituted by the corporation otherwise. The petition in reality inured to the benefit of the corporation and, of course, in turn, to its beneficial stockholders. The petition accomplishes the desired result in a convenient way for all concerned. No one is injured by the form in which it is maintained, since each may make adequate defense thereto. The relief asked for is so clearly interwoven with the duties of the plaintiff in error, as the fiduciary of an estate which he was managing under the control of a court, as to bring his actions under review by that court. The course pursued is not of such an injurious nature as to make it inequitable at the expense of the plaintiff in error. *Morris* v. *Scruggs,* 147 Va. 166, 136 S. E. 655.

■ ■ As to the objection that the representative of Thomas H. Russell should have been made a party, it is sufficient to say that the liability of two trustees participating in the same breach of trust is joint and several, and either may be sued separately. *First & Merchants National Bank* v. *Bank of Waverly,* 170 Va. 496, 197 S. E. 462, 116 A. L. R. 1156; Pomeroy's Equity Jur. (3d Ed.) Vol. 3, sec. 1081.

■ The petitioners sued Rowland, both in his individual capacity and as trustee, and the relief sought is the same in the prayer against him in each capacity. The Staunton Military Academy, Inc. was greatly interested in the relief prayed for. No good reason requires the institution of several separate suits involving in their final consideration the same parties and the same matters, when complete and adequate relief to all parties can be secured in one suit. So far as Rowland, individually, or as a fiduciary, is concerned, the nature of the proceedings here have not denied to him the right of any defense which he might otherwise have made. It is to the interest of all parties concerned, under these circumstances, that once having been convened

at the bar of justice, and having been given an opportunity to make their respective claims and defenses, the proceeding should be allowed to continue on an orderly course to a final adjudication.

In *Campbell* v. *Alsop's Adm'r*, 116 Va. 39, 81 S. E. 31, this court said:

"In *Turner's Adm'r* v. *Citizens Bank*, 111 Va. 184, 192, 68 S. E. 407, 409, the court [at p. 19] quotes approvingly from Pomeroy's Eq. Jur. (2d Ed.) Sec. 109, as follows: 'Equitable remedies * * * are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties.' "

■ The evidence disposes of the defenses of estoppel and laches. The widow of Kable was entitled to receive only the net annual dividends declared on the stock of the school corporation, which were for the support of herself and the children. The balance of the income was to be applied to upbuilding the school "as necessary or advantageous" to its growth and development. The children not only were to take the stock after the death of their mother, but were beneficially interested in the increase of present and future profits earned by the corporation. No ratification or agreement on the part of the widow could operate as an estoppel against the children or the corporation, nor could her laches, if any, bind them.

■ There is no merit in the contention that the petition should have been dismissed because the petitioners undertook to require an accounting of William C. Rowland, Inc., a corporation not a party to the proceeding. This contention was raised for the first time at a rehearing application before the trial court.

William C. Rowland, Inc. was but a shadow of William C. Rowland. He created the corporation. He owned all of its capital stock, operated and controlled its every function.

It was in truth and fact solely another name for Rowland in his business transactions. He received all of its profits, and if it incurred loss, he was the sole sufferer. The situation was such that Rowland could have billed the uniforms to the school in his name or in the name of his corporation, William C. Rowland, Inc. The result to him in either event was the same. The whole of the benefit accrued to Rowland, the individual. The trial court entered no decree against the corporation as such.

The evidence was taken by depositions. On the whole, our findings as to its weight are the same as those of the learned chancellor of the trial court. From the pertinent facts and circumstances we draw the following conclusions:

(1) That after the death of William G. Kable, in 1920, Russell continued to represent Rowland, in ordering uniforms for the school, and Rowland paid to him commissions as before, notwithstanding the changed relations between the school corporation and the several parties after Kable's death. Kable, as the sole owner of the stock of the corporation, could make any contract he pleased so far as it affected his interests alone. The increase in Russell's salary to $10,000 and the payment of $2,500 per year as a member of the executive committee of the board of directors removed reasons for a further supplement to his salary. No actual services appear to have been rendered by Russell in the matter of supervision of the measurement and fitting of the uniforms after he took on the duties and responsibilities of his office as principal or superintendent of the school, except such as might have been performed' as an incident of such office.

(2) That after the death of Kable, although it was a matter of common knowledge to everyone connected with the school and its management that Rowland enjoyed a monopoly in the sale of uniforms to the school, the weight of the evidence is against an open and full disclosure to all interested parties of the payment of the 6% commission to Russell. The fact that the original agreement in Kable's

lifetime was intended to be kept secret affords no justification for secrecy in its continuation after his death. It no longer had his independent supervision.

(3) That the agreement between Rowland and Kable ceased at the latter's death, and could not continue thereafter, when the rights and interests of other parties intervened, without the approval of all interested parties after a full, open and complete disclosure.

As we have seen, there is no record of such disclosure in the minutes of the board of directors or of the executive committee, nor in the records of the Corporation Court of the city of Staunton. The evidence supports the testimony of Mrs. Whitehead that she did not know of the continuance of the payment of commissions to Russell, after her first husband's death, until the deposition of Rowland was taken in this case. There were some circumstances, prior to 1927, which might have put all the directors on notice that there was some agreement between Rowland and Russell, whereby Rowland, or his corporation, enjoyed the exclusive right to sell uniforms to the school, but such knowledge could not affect the beneficial owners of the trust estate.

It is true that the control and responsibility of the corporation was entrusted to an executive committee, of which Rowland was not a member, and that this committee had knowledge of the purchase of the uniforms solely from Rowland, but such knowledge does not excuse or justify the secret arrangement between Rowland and Russell.

(4) That the commissions paid Russell were intended to influence him to purchase uniforms from Rowland, or from the corporation solely owned by him, without competitive bidding, and that this was against the interest of the school corporation; that if Rowland could pay Russell 6% of the price charged for the goods, he could have sold the goods to the school for 6% less than the amount charged; and that it was his duty as a director to sell at such reduced prices.

It is unnecessary to discuss the motives of the witnesses and the several parties. Whatever they may have done for their own interest, it is evident that in a measure they had

the interest of the school at heart, and did much to advance its growth and prosperity. This the parties recognized as to each other, especially Mrs. Whitehead, until the time of the disclosures herein. Since then there have been many charges and counter-charges of fraud, collusion and bad faith. To what extent self-interest prompted the loss of their faith in each other we cannot tell. We are here concerned only with the lawful effect of the transactions under review.

It is difficult to state a rule broad enough to cover all phases of the questions here involved. Textbooks, cyclopedias and the reported cases are filled with varying principles applicable to the special circumstances upon which the several questions are based. To reconcile the cases cited would result in a torture of logic. We must rely upon general principles of equity.

The authorities are agreed that a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation. This does not mean that he may not deal with his corporation or sell his property to the corporation if the transactions are open, fair and honest, and the corporation is represented by competent and authorized agents. The unbending rule is that the director must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his duty to his corporation. The purpose of the law is to secure fidelity in the director. If, in violation of the general rule, he places himself in a position in which he may be tempted, by his own private interest, to disregard that of the corporation, his transactions are voidable at the option of the corporation and may be set aside without showing actual injury. One who is entrusted with the business of another cannot be allowed to make that business an object of interest to himself. Fletcher Cyc. Corp. (Perm. Ed.) Vol. 3, sections 884,

922, 924, 926, 950; *Upton* v. *Produce Co.*, 147 Va. 937, 133 S. E. 576; *United States* v. *Carter*, 217 U. S. 286, 30 S. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594.

 "This rule is wide of application, and extends to every variety of circumstances. It rests upon the principle that as long as the confidential relation lasts the trustee or other fiduciary owes an undivided duty to his beneficiary, and cannot place himself in any other position which would subject him to conflicting duties, or expose him to the temptation of acting contrary to the best interests of his original *cestui que trust*. The rule applies alike to agents, partners, guardians, executors and administrators, directors and managing officers of corporations, as well as to technical trustees." Pomeroy's Eq. Juris. Vol. 3 (3d Ed.) sec. 1077.

In *Wardell* v. *Union Pacific R. Co.*, 103 U. S. 651, 658, 26 L. Ed. 509, the court said:

"It is among the rudiments of the law that the same person cannot act for himself and at the same time, with respect to the same matter, as the agent for another, whose interests are conflicting. Thus a person cannot be a purchaser of property and at the same time the agent of the vendor. The two positions impose different obligations, and their union would at once raise a conflict between interest and duty; and, 'constituted as humanity is, in the majority of cases duty would be overborne in the struggle.' *Marsh* v. *Whitmore*, 21 Wall. (88 U. S.) 178, 183 [22 L. Ed. 482]. The law therefore will always condemn the transactions of a party on his own behalf when, in respect to the matter concerned, he is the agent of others, and will relieve against them whenever their enforcement is seasonably resisted. Directors of corporations and all persons who stand in a fiduciary relation to other parties and are clothed with power to act for them, are subject to this rule; they are not permitted to occupy a position which will conflict with the interests of parties they represent and are bound to protect. They cannot, as agents or trustees, enter into nor authorize contracts on behalf of those for whom they are

appointed to act, and then personally participate in the benefits."

In many respects the rules governing the relationship of principal and agent, especially where a dual agency is involved, are similar to the above. A man cannot be the agent of both the seller and the buyer in the same transaction without the intelligent consent of both. Nor can he unite his personal and fiduciary character in the same transaction without such consent of the *cestui que trust*. Any secret or underhanded dealing in either case renders such transaction voidable. The fairness of the contract or injury to the principal or *cestui que trust* is immaterial. *Central Land Co.* v. *Obenchain,* 92 Va. 130, 22 S. E. 876; *Ferguson* v. *Gooch,* 94 Va. 1, 26 S. E. 397, 40 L. R. A. 234; *Beury* v. *Davis,* 111 Va. 581, 69 S. E. 1050; *Cardozo* v. *Middle Atlantic, etc., Co.,* 116 Va. 342, 82 S. E. 80; *Williams* v. *Bolling,* 138 Va. 244, 121 S. E. 270.

In applying the above rules, it is necessary to keep in mind the distinction between the class of cases where the director sells to his corporation property which is his own and which he could otherwise dispose of if he thought fit, and the class of cases where the officer makes a profit out of property belonging to his corporation. In the latter class, the director is required to refund all profits made, while in the former the transactions are not void, but voidable at the option of the corporation.

Mr. Justice Hudgins, speaking for this court, said, in *Deford* v. *Ballentine Realty Corporation,* 164 Va. 436, 180 S. E. 164:

"A transaction between an officer of a corporation and the corporation is similar to one between a trustee and *cestui que trust*. In *Waddy* v. *Grimes,* 154 Va. 615, 647, 153 S. E. 807, 817, the majority rule is stated thus: 'There is a distinction to be made between transactions occurring directly between a trustee and his *cestui que trust,* and those transactions in which the trustee deals with himself in respect to the trust estate. The latter class of transactions are voidable by the *cestui que trust* at his election without

giving any reason or alleging any fraud, or any advantage or inadequacy of price. But where the trustee deals directly with the *cestui que trust,* the transaction is not *ipso facto* voidable at the election of the *cestui que trust;* but only *prima facie* presumed to be invalid, which presumption may be rebutted.' "

Rowland was a trustee of an estate that owned all of the stock of the corporation. As a director of that corporation, he occupied a fiduciary or *quasi* trust relation towards the corporation and its beneficiary stockholders. Occupying such relationship, he made a contract for the sale to the corporation of all its military uniforms, from which contract he received substantial benefits. This contract was known to all of his fellow-directors and to every one connected with the school. It was obvious that he was selling his own goods, and was securing a profit from the sales. He made another contract with a fellow-director, who was also the principal officer of the same corporation, to pay him commissions on the gross sales made under his contract with the corporation. This latter contract, while a continuation of an agreement with a former owner of the corporation, was not continued by the corporation, after the death of its former owner, with the full approval, complete knowledge and consent of all interested in the corporation.

Colonel Kable may have wanted the commissions paid to Russell as long as he, Kable, lived and controlled the school corporation and supervised its contracts. His death removed such control and supervision. There was no longer any independent supervision from the standpoint of the owners of the corporate stock. Both Rowland and Russell had personal and private interests in the sale and purchase of the uniforms. Rowland's duties as a testamentary trustee and as a director of the corporation were to the school rather than to Russell or himself. Russell's duties as a director, president of the corporation and superintendent of the school were to the school rather than to Rowland or himself. Each of them may have thought that

he was acting in good faith with the school corporation and the estate of Kable; but good faith alone is not sufficient, in the absence of full disclosure and consent of the interested parties, to make an exception to the general rule that a trustee or director cannot enter into any relation or do any act inconsistent with the interest of the beneficiary he represents. They each owed a loyalty to their trust which was superior to their personal interests.

The experience of years has justified the wisdom of the rule which prohibits directors of corporations and all persons who stand in a fiduciary relation to other parties and are clothed with power to act for them from occupying a position which will conflict with the interest of the parties they represent and are bound to protect. The motive of self-interest is so natural and the danger of temptation to secure private advantage so great that the law recognizes the necessity of a disqualification where other interests come in conflict. Everywhere civil jurisprudence, from motives of public policy, stamps with its condemnation dealings in conflict with the general rule. There are no circumstances in this case which justify an exception to that rule. There can be no hardship comparable to the evil which would result from the application of any other rule.

The beneficiaries of Kable's estate do not here seek to rescind the contract and ask for a return of the goods,— a return being impossible,—but pray a recovery of all profits received by Rowland in breach of his fiduciary relation.

In Virginia, we have held that, in administering the equitable remedies in a stockholders' suit to recover secret profits from the officers of a corporation, the "fundamental theory upon which equity acts is that of restoration—of restoring the defrauded party primarily and the fraudulent party as a necessary incident—to the positions which they occupied before the fraud was committed." *Upton* v. *Produce Co., supra* [147 Va. 937, 133 S. E. 580].

The above cited case involved the recovery of profits from a secret transaction, partly made in dealing with the assets of a trust estate. In determining to whom the profits be-

longed, this court applied the maxim that he who seeks equity must do equity, and, in awarding relief, gave even to the wrongdoer his just due. In the instant case, the transactions between Rowland and Russell were secret, although the contract between Rowland and the school for the uniforms was not a secret. Nor was it a secret that Rowland was making some profit. Besides, the school admittedly sold the uniforms at a profit, notwithstanding the price charged to it by Rowland.

██ Since we have already determined that the 6% commissions paid to Russell were a fixed profit added to the price of the uniforms sold to the school, the only other loss the school suffered, if any, was the difference between the price paid by it for the uniforms less 6%, and what it might have been required to pay to others for the same quality of goods. The restoration of the commissions and such differences will save the school from loss and leave to Rowland whatever was due to him.

██ ██ In applying the foregoing principles to the facts of this case, we are of opinion that the trial court did not err in requiring the resignation of William C. Rowland as a testamentary trustee; and that there was no error in holding William C. Rowland liable to account to the Staunton Military Academy, Inc., for the profits specified in its decree, to be ascertained and measured by the method therein prescribed. However, we are of opinion, giving full consideration to all of the peculiar circumstances of this case and the equities involved, that compound interest should not be allowed on that portion of the profits represented by commissions paid to Russell, but simple interest only at the rate of 6% per annum. Rowland was making the profits from a sale of his own property, and not from a sale of the property of the corporation. In that sense, the profits were the fruit of ownership, however much his relationship as a director and the commissions paid Russell assured him of freedom from competition. It is the relationship which requires accountability.

The decree complained of will be modified by the allowance of simple interest at 6% per annum on the amount of the commissions ascertained to have been paid to Thomas H. Russell instead of compound interest thereon, and will be affirmed in all other respects. It being necessary to take an account to ascertain the amount of the liability of William C. Rowland to the Staunton Military Academy, Inc. for the profits in question, this cause is remanded to the trial court for such further proceedings as may be necessary to accomplish that purpose, in accordance with the views herein expressed.

*Affirmed as modified and remanded.*

CAMPBELL, C.J., and BROWNING, J., dissenting.

HUDGINS, J., concurring.

The pleadings filed are irregular, but respondent waived the questions raised by his demurrer and elected to submit the case to the trial court on its merits. This election binds him in this court.

The principle governing the decision of this case is thus stated in *Deford* v. *Ballentine Realty Corporation,* 164 Va. 436, 180 S. E. 164: "It is settled that because of the relationship existing between an officer and a corporation, the officer cannot deal with the corporation at arm's length, even though the other directors are acting for it. Such officer cannot deal with the corporation as a stranger, because the position of confidence which he holds enables him to acquire an intimate knowledge of the affairs of the corporation and to influence those associated with him in its management. Fletcher on Corporations, vol. 3, section 950. This, however, does not prevent an officer from dealing with a corporation, provided he does so in good faith and the sale is open, fair and honest. *Howland* v. *Corn* (C. C. A.) 232 F. 35."

13 Am. Jur. 958, section 1005, states the same principle in the following language: "A director or officer of a cor-

poration is not absolutely precluded by his official position from dealing or entering into a contract with the corporation, nor is such a transaction void *per se.* While it is true, on the one hand, that where the directors or officers of a corporation deal with themselves as individuals, the transactions are subject to the closest scrutiny, under the most searching light of truth, and must be characterized by absolute good faith, it is also true, on the other hand, that where persons holding positions of trust and confidence in a corporation deal with the corporation, which is also represented by others, in entire good faith, fairness, and honesty, such transactions are not invalid and will be upheld."

This principle, applied to three outstanding facts established in this record, renders it imperative to decide the case for plaintiffs.

First, Rowland occupied a dual fiduciary relationship to the stockholders of the corporation; that is, (a) he was one of five testamentary trustees who were charged with the duty of electing directors of the corporation, and (b) he performed this duty by voting the stock for himself as a director. It is true that the will gave him this power, but the fact that he used it to elect himself a director made it all the more imperative that he discharge the duty imposed by law upon a director with even more good faith and fidelity than usually pertains to the office.

Second, Rowland, prior to his assumption of this fiduciary relationship, had employed Thomas H. Russell as his representative to sell the merchandise manufactured by him to the corporation. The terms and conditions of this employment are set forth in two letters signed by Rowland. The pertinent part of one, dated January 15, 1906, and addressed to Major Thomas H. Russell, reads: "The proposition for a 6% basis on all orders sent by you will be acceptable to me. I look forward with pleasure in having you representing me at your school." The other letter was dated January 16, 1906, and addressed to Captain W. G. Kable. The pertinent part reads: "Yesterday A.M. I wrote Major Russell accepting his offer on a 6% basis. As all the orders

from your place had come through you I desired to have your view on this matter, so when Maj. R. wrote he had seen you I closed the deal. * * *. Shall all orders hereafter for all goods be handled through the Major (Russell)?"

Rowland testified that under this contract, made in 1906, he continued to pay Russell commissions after Captain Kable's death. The total amount of the commissions so paid was about $67,000. His defense of his action is that, since the agreement was made with Kable's consent, he felt authorized to continue the business relations with Russell after Captain Kable's death. This explanation is not sufficient to justify the payments of commissions in view of the fact that the will changed the relation of the parties to each other and to the corporation. Rowland testified that, after 1920, the contracts for the purchase of uniforms from him were made by Colonel Russell, "either verbally or in writing, until the late years. The last few years the Board directed it by minute." In other words, the buyer, whose duty it was to act for his corporation, was receiving compensation from the seller, who was acting for himself although a director in the same corporation. It thus appears that, when the contracts were consummated, the corporation, although one of the contracting parties, was not represented by a disinterested officer or agent.

Third, Rowland contends that the commissions were paid in return for separate and distinct services rendered Rowland. The weight of the evidence supports the conclusion of the trial judge, which is stated in this language: "The contention by and on behalf of the defendant that T. H. Russell ever rendered any material service for the defendant, other than making it practically certain that defendant should enjoy a monopoly of sales of goods to the school, is not only not supported, but, it seems to me, is refuted by the evidence, certainly as to any such services rendered after the death of Kable."

One provision of the will imposed upon the testamentary trustees the duty to so vote the stock "as to cause the said corporation to employ * * * Thos. H. Russell as Principal of

the Staunton Military Academy * * * so long as * * * Russell shall live and be able or desire to be so employed and shall conduct himself and the affairs of said office in a proper manner * * * the reasonable salary to be paid to him for his services * * * shall never exceed the sum of $10,000.00 per year * * *."

Russell was disappointed because of the testator's failure to make any provision in the will permitting Russell to acquire the military school in his own right. He was regarded as a very able educator and executive. The trustees and directors were anxious to carry out the wish of the testator to retain Russell as the principal. In order to do this these officers, immediately upon assuming the duties of office, raised Russell's salary from $6,000 to $10,000, the maximum allowed under the will.

Notwithstanding the fact that Russell received the maximum compensation allowed under the will, he had other sources of compensation derived from his connection with the school.

1. W. H. Steele and others had been conducting as a private enterprise upon the school premises a canteen or store in which supplies were sold to the students and faculty. Within a short time after Captain Kable's death Russell became a silent partner in this store. As such partner, his net profits frequently were in excess of $3,000 per year. After 1930, largely through Rowland's influence, the profits of this store were transferred from the individuals to the corporation.

2. By advice and consent of the corporation court of the city of Staunton, Russell was paid $200 per year as testamentary trustee, and $2,500 per year as a member of the executive committee of the corporation. In addition to these sums, one year Russell received, along with the other directors, $1,000 for services rendered as a director. The allowance of this extra compensation shows that the board of directors and the corporation court of the city of Staunton construed the provisions of the will liberally in favor of Thomas H. Russell. It does not appear that either the

directors or the corporation court were asked to rule upon the propriety of the executive head of the school receiving compensation from a director who was selling his own manufactured articles to the corporation.

It was the duty of the chief executive of the school to supervise all of its activities, particularly the purchase of uniforms, as it was from this source that the corporation derived approximately 80% of its profits. This conclusion is inescapable. When Russell, as chief executive, was making the contracts with Rowland for the purchase of these uniforms, he knew that he would be paid 6% commissions on the gross amounts of the contract price. He is bound to have been consciously or unconsciously influenced by knowledge of this fact. The corporation had a right to purchase uniforms from one of its directors and the director had a right to sell the corporation property owned by him, but, in order for such contract to be valid, the corporation must be represented by a disinterested officer or agent.

Rowland's final contention is that the executive committee and the directors of the corporation knew and approved of his sale of uniforms to the corporation and his payment of commissions to Russell.

It is true that it was generally known by officers, employees and others that Rowland did have a monopoly on the sale of these articles to the school, but the payments to Russell were not made openly and aboveboard. Rowland's checks to Russell were not sent by mail nor deposited in a local bank in Staunton. All of them were deposited to Russell's credit in a bank in Philadelphia, and the deposits were immediately withdrawn by Russell. No reference is found in the minutes of the directors or the executive committee to the contract price of the uniforms or to the fact that commissions were paid to Russell. The fact that Russell represented Rowland in these specific matters was not known to J. M. Perry, attorney for the directors and the estate, until after the death of Colonel Russell, nor were these business relations officially brought to the attention

of the corporation court of the city of Staunton, as were other matters of equal or less importance.

Mr. Perry testified, "I never talked with Mr. Rowland about that matter (payment of commissions) that I recollect until I was informed of the fact—which must have been after Colonel Russell's death—and I thought then, and I think now, that if services were rendered and the dealings was open and fair, it was a legitimate payment." This is a correct statement of the legal principle applicable, but, as heretofore pointed out, the evidence does not disclose that Russell rendered Rowland any service which entitled him to receive compensation therefor. Rowland stated that Russell took the measurements of the students for the uniforms, supervised their tailoring, received the uniforms upon their arrival at the school, and distributed them to the students. This is the entire service that Rowland claims Russell performed for him. The overwhelming weight of the evidence shows that, after Colonel Kable's death, Russell confined his attention to giving, or supervising the giving of orders for the uniforms. This was a service he owed to the corporation and not to Rowland.

The trial court found that "the weight of the evidence is against the claim that the matter of the continued representation by Russell of Rowland in sales of uniforms to the school, was either formally or informally discussed with the directors so that all were fully advised of these dealings between Rowland and Russell."

Many statements in the correspondence that passed between Rowland, on the one hand, and Russell, Steele and other employees of the corporation, on the other, warrant the conclusion that Rowland was opposed to and resented any efforts made by any officer or employee of the school to ascertain from other sources the market price or quality of uniforms required by the corporation. A careful perusal of these many letters leaves the distinct impression that Rowland thought that, by reason of his fiduciary relationship to the corporation, he was entitled to have a monopoly on the sale of uniforms to it.

All these facts and circumstances bring the case squarely within the influence of the principle cited. The question is settled in Virginia, and is settled in accord with the weight of authority, both English and American. Under the circumstances, I am compelled to concur in the conclusion reached by Mr. Justice Spratley.