## Richmond

### GUNTHER K. KESSLER, ET AL., ETC. v. COMMONWEALTH DOCTORS HOSPITAL, INC., ET AL., ETC.

November 29, 1971.

Record No. 7632.

Present, Snead, C.J., Carrico, Gordon, Harrison and Cochran, JJ.

· R. J. Lillard (R. W. Church, Jr.; McCandlish, Lillard & Marsh, on brief), for appellants.

Henry St. John FitzGerald (Tolbert, Lewis & FitzGerald, on brief), for appellees.

COCHRAN, J., delivered the opinion of the court.

Appellants, Gunther K. Kessler, Dorothy C. Kessler, and Gunther K. Kessler, Trustee, filed their bill of complaint under the Declaratory Judgment Act against appellee, Commonwealth Doctors Hospital, Inc., its directors and their successors. The Kesslers asked that their rights in 3775 shares of common stock of Commonwealth issued in their names be confirmed, that Commonwealth and its directors be enjoined from taking action contrary to the Kesslers' interests in the stock, and that compensatory and punitive damages be awarded against members of Commonwealth's Executive Committee for undertaking to cancel the stock.

Commonwealth and its directors answered, alleging that complainant, Gunther K. Kessler, did not come into equity with clean hands and that the cause must therefore be dismissed, that the stock had been obtained by the Kesslers in violation of the Virginia Securities Act and of fiduciary duties owed by Gunther K. Kessler to Commonwealth's directors and to Commonwealth, and that Commonwealth's Executive Committee had legal authority to cancel the 3775 shares of stock in controversy. Commonwealth also filed a cross-claim asking that sale of the 3775 shares to the Kesslers be rescinded. The Kesslers filed a demurrer and answer to the cross-claim, denying that Gunther K. Kessler had violated any fiduciary duty to Commonwealth or to the other directors. Subsequently, the Kesslers took a voluntary non-suit of their claim for compensatory and punitive damages against members of Commonwealth's Executive Committee.

Some of the disputed stock was issued in the name of Gunther K. Kessler, Trustee, and some in the names of Gunther K. Kessler and Dorothy C. Kessler. But the actions of only Gunther K. Kessler are questioned and for convenience the stock in controversy will be considered as if only he were the record owner thereof.

After hearing the evidence *ore tenus* the chancellor decided that 500 shares of the stock had been validly acquired by Kessler but that 3275 shares had been obtained in violation of a fiduciary duty owed by Kessler to certain other directors. From the final decree entered July 17, 1970, holding that the issuance of these shares was void and directing Commonwealth to repay the purchase price with interest to the date of repayment, we granted the Kesslers an appeal.

A statement of incidents of the trial signed by the chancellor on September 10, 1970, included this reference to the final decree previously entered:

"The chancellor refused to include in the proposed decree a finding

"(a) That the Plaintiff does not come into equity with clean hands and for that reason must be denied relief; and

"(b) The Plaintiff has failed to bear his burden of proving by a preponderance of the evidence that he is entitled to the relief he seeks. The Chancellor stated that he did not decide the case on a preponderance of the evidence; and

"(c) That the rescission and avoidance of the 3275 shares of stock by the corporation was valid. He included a finding that the issuance to the Complainants of 3275 shares of stock was invalid; . . ."

The language of paragraph (b) indicates that the chancellor based his conclusions of law on uncontradicted evidence which made it unnecessary for him to pass on the credibility of witnesses. We will rely on the same facts in our consideration of the case.

The uncontradicted evidence shows that Kessler had been one of the organizers of Commonwealth in 1964, when it had been incorporated for the purpose of constructing and operating a private general hospital. He served as a director from its organization to April 24, 1969, secretary from organization to May 19, 1966, vice-president from May 19, 1966 to August 8, 1968, and a member of the executive committee from organization to August 8, 1968. Indeed, it appears from the record that he, more than any other person, was the driving force that caused Commonwealth to succeed. The chancellor's finding that Kessler "worked hard for the corporation" seems to be a conservative appraisal of his services. The record reveals that he contributed a major part of his time, without compensation, to the problems incident to the financing and construction of the hospital.

■ When common stock of Commonwealth was first sold pursuant to registration under the Virginia Securities Act, Kessler was designated Licensed Agent for the sale. He devoted his efforts, without compensation, to the successful distribution of the stock.

A second issue of stock was authorized by action taken at the annual meeting of stockholders held on May 19, 1966, when the following resolution was also approved:

"Inasmuch as the directors of the corporation and their wives will be required to endorse the first trust mortgage note which

will be in excess of $1 million, and inasmuch as the directors of the corporation will have to give considerable time to further the interest of this corporation, be it therefor [sic] resolved that the directors will be authorized to purchase shares at par value not to exceed 500 shares for each director; and be it further resolved that a waiver of this authorization by any director can only be executed in favor of another director."

Minutes of a meeting of the Executive Committee held on December 8, 1966, include this statement:

"The members of the Board of Directors will have until the 30th of June 1967 to exercise their stock options. Then there will be a two-week period in which others on the Board of Directors can pick up the stock which remains unpurchased under this option."

On December 15, 1966, the following resolution was approved by the Board of Directors:

"There was a discussion of the option that each member of the board of directors has to purchase 500 shares of stock.

"Upon motion duly made and seconded and carried, it was resolved that a deadline for buying this stock is June 1, 1967. It is to be noted that if by April 1, 1967, directors have indicated they will pick up the option, they will be morally obligated to produce the money by the first of June, 1967.

"If, by the first of April, no notification has been given to the agent, the agent will be free to dispose of the balance of stock unclaimed among the directors willing to pick it up."

The "agent" referred to in the foregoing resolution was Kessler, for he was again the Licensed Agent for sale of Commonwealth stock. The option price to directors of $10 per share, the par value of the stock, was $5 per share less than the price to the general public. Kessler kept the stock books and attended to details of sales.

There were sixteen directors of Commonwealth, most of whom were doctors. According to the record they reposed complete trust and confidence in Kessler and left many of the business problems of the corporation for him to solve, especially during the difficult period of construction when success of the venture was doubtful. The hos-

pital opened in July, 1967, and became a profitable operation, thereby steadily enhancing the value of Commonwealth's stock.

By June 18, 1967, only four directors, including Kessler, had paid for stock to which they were entitled under their options. Each had purchased 500 shares, making a total of 2000 shares out of the 8000 shares available to directors. Several weeks later four other directors paid for stock at the option price, one purchasing 100 shares, one 500 shares, one 750 shares, including 250 shares assigned to him under another director's option, and one 250 shares. Thus, on July 13, 1967, when a meeting of the Board of Directors was held, only 3600 shares had been purchased and paid for by the directors. At this meeting, however, Kessler reported that all option shares had been sold. He was not questioned on the subject and did not volunteer the information that he intended to purchase most of the unclaimed option stock.

Later in July and in August, 1967, 3275 shares were issued to Kessler and 125 to another director, Dr. Soltany, all as unclaimed option stock. In August 500 shares were also issued under his director's option to the corporate counsel, who had been ill in July.

Dr. Gazale, one of Commonwealth's organizers, its president and board chairman, on July 1, 1967, had delivered his check for $5000 to Kessler. According to Kessler the check was for Gazale's option stock but was not to be deposited without authorization, which was never forthcoming. According to Gazale it was to be held pending completion of arrangements for him and Kessler to divide all the unclaimed option stock after Kessler had determined that other directors did not desire to participate in the purchase. In April, 1968, Kessler used the Gazale option rights to purchase 500 shares of stock at $10 per share, making a total of 8000 shares issued to directors, of which 4275 shares were acquired by Kessler.

Of Kessler's stock, 500 shares had been purchased under his own option as a director. An additional 500 shares had been purchased under the option of another director, Dr. Romaine, who prior to his death, executed a written waiver of his option right to Kessler. The remaining 3275 shares had been purchased by Kessler at the option price, using the unclaimed option rights of other directors.

The chancellor found that Kessler occupied a fiduciary relationship with his fellow directors which required him to make full disclosure to them of his activities in the stock acquisition. The chancellor obviously disbelieved the selfserving testimony of some of the directors,

He stated that some "probably knew what was going on" and that those who did not subscribe to their option shares "would hardly be thought to have been interested in subscribing to the unclaimed shares." Nevertheless, he believed that there were others, whom Kessler had not consulted, who desired to purchase unclaimed option shares. He concluded that "even though Mr. Kessler may have acted in good faith . . ." there was at least a technical violation of a fiduciary duty to his fellow directors from which Kessler would not be permitted to profit.

We do not believe that the corporate resolutions and other undisputed facts were sufficient to establish the existence of a fiduciary relationship between Kessler and the other directors as individuals. *See Sutton* v. *Sutton*, 194 Va. 179, 185, 72 S.E.2d 275, 278 (1952). However, Kessler did owe a fiduciary duty to the corporation of which he was an officer, a director and the Licensed Agent for the sale of stock, to carry out his assigned responsibilities. *Trayer* v. *Bristol Parking*, 198 Va. 595, 604, 95 S.E.2d 224, 230 (1956). Although the chancellor found it unnecessary to decide whether Kessler had breached his fiduciary duty to the corporation, we believe that uncontradicted evidence shows that he did breach this duty.

The plain import of the corporate directives was that each director should have the right to purchase not more than 500 shares at the special price, that a director could only waive his option rights in favor of another director, and that unclaimed option stock should be distributed "among the directors willing to pick it up." These provisions embraced legitimate corporate objectives. As the directors were expected to accept exposure to personal liability for substantial corporate obligations it was reasonable for the stockholders to offer them the opportunity to purchase additional stock at a discount. It might also be advantageous to Commonwealth to have a broad distribution of the stock among the directors in order to give them greater incentive to participate actively in the corporate management. Conversely, a concentration of stock might have an adverse effect on the corporation. So the interest of Commonwealth was not limited to the mere receipt of $10 per share for 8000 shares of stock made available under directors' options.

There was no prohibition against Kessler's dealing with himself as well as with his fellow directors. Indeed, the corporate directive of December 15, 1966, authorized him to do so. So long as he complied

with his instructions he was not in violation of any duty to Commonwealth. *See In re Flagg's Estate*, 365 Pa. 82, 73 A.2d 411 (1950). As Licensed Agent he could, and did, properly sell to himself at the option price the 500 shares to which he was entitled as a director and the 500 shares waived to him by another director. Moreover, as appellees concede, he had as much right as other directors to purchase unclaimed option stock. But the fact that Kessler could deal with himself made it imperative that he avoid any conflict between his interests and those of his corporation. Having accepted the responsibility for selling the stock he was required to sell it only as authorized, regardless of his understandable exasperation at the uncooperative attitude of other directors. *See Williams* v. *Fidelity Loan & Savings Co.*, 142 Va. 43, 67, 128 S.E. 615, 622 (1925).

In *Rowland* v. *Kable*, 174 Va. 343, 6 S.E.2d 633 (1940) we outlined the principles which apply to a director dealing with his corporation:

> "The authorities are agreed that a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation. This does not mean that he may not deal with his corporation or sell his property to the corporation if the transactions are open, fair and honest, and the corporation is represented by competent and authorized agents. The unbending rule is that the director must act in the utmost good faith, and this good faith forbids placing himself in a position where his individual interest clashes with his duty to his corporation. The purpose of the law is to secure fidelity in the director. If, in violation of the general rule, he places himself in a position in which he may be tempted, by his own private interest, to disregard that of the corporation, his transactions are voidable at the option of the corporation and may be set aside without showing actual injury." *Id.* at 366, 6 S.E.2d at 642.

We construe the corporate resolution of December 15, 1966, to require that Kessler consult all interested directors before selling unclaimed shares to himself or any other director. This the chancellor found that he had failed to do. Even if he acted in good faith, this failure constituted a breach of his duty to Commonwealth. Kessler

could purchase the unclaimed shares for himself only if he complied with the terms of the board resolution or made a full disclosure of his intentions to the corporation. He did neither and his acquisition of 3275 shares was therefore voidable at the election of Commonwealth, even though there was no inadequacy of price. *Rowland* v. *Kable, supra.*

We conclude that the chancellor, while assigning the wrong reason for his ruling, reached the correct result. Under these circumstances the decree appealed from will be affirmed. *Robbins* v. *Grimes,* 211 Va. 97, 100, 175 S.E.2d 246, 248 (1970).

*Affirmed.*