846 F.2d 74
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SURETY FEDERAL SAVINGS & LOAN ASSOCIATION, Plaintiff-Appellant,
v.
INTERSTATE SECURITIES, INC., Defendant-Appellee,
and
Rouse Woodstock, Inc., A.G. Becker, Inc., Merrill Lynch
Futures, Inc., formerly known as Merrill Lynch
Commodities, Inc., Defendants,
v.
Billy DAVIS, Charles T. Henson, Rickey Reynolds, Third Party
Defendants.
 No. 87-3618.
 United States Court of Appeals, Fourth Circuit.
 Argued March 10, 1988.
Decided May 6, 1988.
 
 Glen H. Kanwit (James D. Ossyra, Hopkins & Sutter, Charles D. Dixon, Steven M. Thomas, Patrick, Harper & Dixon on brief) for appellant.
 Matthew R. Joyner, Jeffrey J. Davis (Moore & Van Allen on brief) for appellee.
 Before DONALD RUSSELL and K.K. HALL, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Surety Federal Savings & Loan Association (Surety) appeals from an order of the district court granting summary judgment in favor of the appellee, Interstate Securities, Inc. (Interstate). The district court concluded that Surety was barred by the applicable statute of limitations[1] and we affirm.
 
 
 2
 On December 14, 1981, William Crothers, an investment adviser with Interstate, made a presentation to the Board of Directors of Surety in which he outlined a "Financial Futures Program" for Surety to follow. The Board of Surety approved a plan in which Surety would hedge its possible interest rate losses with financial futures positions. The basic concept of this plan was that if Surety were losing money because of rising interest rates then that loss would be offset by its gains in the financial futures market. Likewise, if interest rates fell and Surety began losing money in the financial futures market, then that loss would be offset by Surety's savings in interest rates paid.
 
 
 3
 Surety became aware that it was losing significant amounts of money in its dealings with Interstate: On April 19, 1982, the loss was $88,500.00; by May 17, 1982, the loss had increased to $153,250.00; by August 13, 1982, the loss from Interstate's dealings was $234,625.00.
 
 
 4
 Despite these losses, Surety continued with the plan that had been devised in the December 14, 1981 meeting and on August 23, 1982 opened another account with Interstate which hedged Government National Mortgage Association Certificates (GNMAs) with T-Bonds. Losses in these dealings also began almost immediately.
 
 
 5
 It is undisputed that all of these losses were reported to Surety's Board of Directors. It is also undisputed that Surety's Board established an Investment Committee to oversee the financial futures program and that that Committee never met. Further, the district court was particularly influenced by the fact that the Board knew something was wrong. One Director was "shocked" at the losses reported on August 16, 1982; another said that the losses reported on October 18, 1982 were "shocking to everybody." However, this action was not filed until October 28, 1985.
 
 
 6
 This Court has held that the statute of limitations for securities fraud begins to run when "the fraud is either actually known or should have been discovered by the exercise of due diligence." Newman v. Prior, 518 F.2d 97, 100 (4th Cir.1975). Surety's argument in this case is that they did not conclusively know of Interstate's mismanagement. However, that does not address the question of whether they should have known.
 
 
 7
 Surety's basic contention is that losses by themselves meant nothing. Surety asserts that only by comparing the losses in the futures market with the gains in Surety's savings that were supposed to correspond in these times of dropping interest rates could it be determined if Surety's overall position were actually worsening. In short, Surety's plan with Interstate was that for each dollar lost in the futures market, a dollar would be gained by Surety's savings in interest paid to its customers. Therefore, a loss in the futures market would not necessarily be a bad thing so long as it was being offset as planned. And, Surety argues, while they were told of the losses in the futures market they were not apprised of the net effect until March 1983 at which time Surety's Controller told the Board that everything was going as planned. Surety's other contention is that the GNMA trading which began in August 1982 was a separate transaction which needs to be considered apart from its dealings in the financial futures market.
 
 
 8
 The district court committed no error in its judgment that Surety should have known of Interstate's wrongdoings no later than October 18, 1982. Simply because Interstate never presented Surety with all the evidence of wrongdoing was no excuse for Surety not to investigate. Indeed, the evidence clearly indicates that Surety's Board of Directors suspected wrongdoings at least by the October 18, 1982 meeting when everyone was shocked by news of the heavy losses. Even as early as the April 19, 1982 meeting when the first loss of $88,500.00 was reported, the Board was concerned enough to hire a second securities firm so that it would not have "all [of its] eggs in one basket." Despite these warnings and despite the fact that the Board of Directors of a Savings and Loan was probably a fairly sophisticated investor, the Investment Committee never once met to review these investments. As for the March 1983 meeting in which Surety was told that everything was going as planned, the Chairman of the Board conceded that "everybody on the board" knew that this report was false. While Surety may not have known for sure of Interstate's wrongdoing, Newman requires only that the wrongdoing "should have been discovered by the exercise of due diligence." Newman at 100. The district court did not err in concluding that the mismanagement should have been discovered at least by October 18, 1982 when everybody on the board was shocked by the losses that had occurred.
 
 
 9
 Surety's argument that the GNMAs constitute an entirely separate transaction is without merit. The GNMAs were merely another part of the strategy recommended by Interstate and approved by Surety at the original December 1981 meeting. Further, even when the GNMAs were purchased in August 1982, it appears that losses from them became evident soon thereafter. Combined with the on-going losses in the futures trading, this immediate loss in the GNMA market should have resulted in an investigation by Surety.
 
 
 10
 In dealing with a similar case, the Court of Appeals for the Seventh Circuit noted that
 
 
 11
 On appeal, the plaintiffs first allege that it is improper to dispose of statute of limitations issues in securities cases by summary judgment. Our case law demonstrates conclusively that there is no such procedural impediment to the granting of summary judgment.
 
 
 12
 Gieringer v. Silverman, 731 F.2d 1272 (7th Cir.1984).
 
 
 13
 As summary judgment is appropriate in cases of this nature and as the district court is supported in its judgment that Surety should have known of the alleged wrongdoings by October 18, 1982, but did not file suit until October 28, 1985, the district court acted properly in granting summary judgment in favor of Interstate regardless of whether the applicable statute of limitations is two or three years.
 
 
 14
 Accordingly, the judgment of the district court is
 
 
 15
 AFFIRMED.
 
 
 
 [1]
 There was some dispute as to whether the applicable statute of limitations should be two or three years. However, even given a three year statute of limitations, Surety will still be barred