**James D. BYELICK, Plaintiff,**

v.

**John H. VIVADELLI, Stephany C. Vivadelli and V Technologies International Corporation, jointly and severally, Defendants.**

No. CIV.A. 3:98CV787.

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 20, 1999.

Bruce E. Arkema, Cantor, Arkema & Edmonds, Richmond, VA, Michael B. Butler, Atlanta, GA, for Plaintiff.

David D. Hopper, Mezzullo & McCandlish, Richmond, VA, Mark W. Ryan, Andrew J. Morris, Mayer, Brown & Flatt, Washington, D.C., for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

This multi-count action presents claims of insider trading, securities fraud under state and federal law, common law fraud, breach of fiduciary duty, conspiracy, aiding and abetting, and breach of an employment contract. The facts giving rise to those claims are somewhat complex, and are set forth below.

### STATEMENT OF FACTS

On July 26, 1994, V Technologies International Corporation ("VTIC") was incorporated in the State of Virginia. VTIC was in the business of developing and selling computer software for "hoteling," the practice of managing limited office space by coordinating the schedules of employees and other users of space with the space available in a particular office or building.

VTIC has two shareholders: James D. Byelick and John Vivadelli ("Vivadelli"). Byelick paid $4,800 for 40% of VTIC's shares, and Vivadelli paid $1,800 for 60% of the company's shares. Byelick served as Secretary, Treasurer and Chief Financial Officer of VTIC from August 1994 until December 18, 1995, when he ceased working for the company and moved to California.

Shortly after VTIC was incorporated, the Board of Directors, then consisting of Vivadelli and Byelick, set the compensation level for certain employees, including an annual salary of $50,000 for Byelick, and $50,000 to Vivadelli, who was the company's President. During the 18 months of his employment with VTIC, Byelick was never paid any salary.[1]

Because VTIC had paid him no salary at all, Byelick decided in late 1995 that he would pursue work in California. At the time, Byelick still owned 40% of the stock of VTIC, and Vivadelli expressed a desire to acquire some or all of the shares owned by Byelick. The facts surrounding the eventual transfer of 900 shares from Byelick to Vivadelli are in dispute: Byelick alleges that Vivadelli demanded return of all stock, contending that Byelick was entitled to retain it only if he continued in the employment by VTIC, while Vivadelli characterizes his overtures as an offer to purchase the stock. The minutes of a December 19, 1995 Board meeting reflect this disagreement, because they set out Vivadelli's position that Byelick's 40% ownership was intended to be his sole compensation until such time as VTIC was able to pay his salary, and Byelick's contrary position that he is entitled to his unpaid salary.

On March 13, 1996, Byelick was removed as director of VTIC and was replaced by Vivadelli's wife, Stephany Vivadelli ("S.Vivadelli"). Byelick's removal was accomplished by the Board of Directors, which was then comprised of Vivadelli and Byelick, although Byelick abstained from voting on this matter and raised no claim respecting notice of the Board meeting at which his removal was accomplished. Immediately upon Byelick's removal, the Board of Directors, now consisting solely of Vivadelli, voted to install S. Vivadelli as Byelick's successor. Later, on March 27, Vivadelli and his wife, as directors, caused VTIC to revoke the resolution that had set Byelick's salary at $50,000.

1. In March 1996, Vivadelli caused the salary resolution to be revoked. Nonetheless, Vivadelli caused VTIC to pay himself bonuses on at least 3 occasions.

On April 25, 1996, Vivadelli sent a letter to Byelick outlining the terms of an agreement respecting the sale of Byelick's stock to Vivadelli and providing a space for Byelick's signature. The letter provided that, in consideration of the transfer of 900 shares of Byelick's 1200 shares, Vivadelli was to indemnify Byelick from personal liability on a $100,000 VTIC note held by Cambria Medical Supply Company and guaranteed by Byelick. Byelick signed the letter in the space provided and faxed it back to Vivadelli on May 17, 1996. Some three and a half months later, on September 13, 1996, following the exchange of correspondence respecting whether Vivadelli was to release or to indemnify Byelick, Byelick executed what the pleadings refer to as the "Byelick September Stock Sale" by which Byelick sold 900 shares to Vivadelli.

Byelick's stock was originally issued subject to VTIC's right to repurchase that stock in the event that it was offered for sale. On May 23, 1996, Vivadelli and his wife, as directors of VTIC, voted to waive the company's right of first refusal on Byelick's stock, apparently to enable Vivadelli to purchase that stock. Following the transaction, Byelick owned only 10% of VTIC.

On November 1, 1996, VTIC's Board of Directors—by then comprised of Vivadelli and S. Vivadelli—eliminated the shareholders' preemptive rights which were provided for in the company's by-laws. Then, on December 30, 1996, Vivadelli and his wife, as VTIC directors, approved and authorized the sale by VTIC of 50,000 additional shares of stock to Vivadelli, referred to in the pleadings as the "December 1996 Stock Sale." That transaction effectively reduced Byelick's ownership interest in the company from 10% to 1%.

During the early months of 1996 and continuing until December 18, 1997, Byelick and Vivadelli engaged in at least two dozen telephone conversations. According to Byelick's Amended Complaint (¶ 29), five representations made by Vivadelli during these conversations were fraudulent and caused Byelick to rely on them in his eventual sale of stock to Vivadelli. Byelick contended that the representations violated the Securities Exchange Act of 1934, 15 U.S.C. § 77a *et seq.*, and the Rules promulgated under the Act, as well as the parallel provisions of the California Corporate Code. The same allegations also formed the predicate for the common-law fraud, breach of fiduciary duty, and conspiracy and aiding and abetting claims. As pleaded, the representations are:

a. "that the Corporation's proprietary software was not working."

b. "that the engineering staff of the Corporation were working desperately to re-write the source code of the software to get the product to work, and that because of this fact, the engineers were unable to respond to customer requests for services."

c. "that old customers of the Corporation were refusing to pay the Corporation's invoices for products and services previously provided by the Corporation and such customers were refusing to expand past initial, small-scale pilot programs," and that "no new customers had signed agreements or contracts for the Corporation's products and services."

d. "that the Corporation was experiencing extreme cash flow problems and a continuing liquidity crunch which had prevented the Corporation from paying its bills as they came due which brought the Corporation to the 'end of the road.'"

e. "that [Vivadelli] expected the Corporation to be forced to go out of business in the near future because of the problems set forth above."

In addition to these alleged affirmative misrepresentations, Byelick claims that Vivadelli and his wife, S. Vivadelli, failed to disclose certain financial information during 1996 which they, as corporate di-

rectors, were required to disclose. The allegedly undisclosed information includes the existence of certain contracts between VTIC and its clients which Byelick contends increased the value of his stock in VTIC.

Byelick contends that he did not become fully aware of the falsity of Vivadelli's representations or of the alleged omissions until January 1998, when Byelick first reviewed financial records for 1995 and 1996, which were first made available to him at the end of December 1997. In January of 1998, Byelick unsuccessfully asked Vivadelli to rescind the September Stock Sale and made a written demand for inspection of the corporation's books.

On August 28, 1998, VTIC received a written offer from Edison Venture Fund, in which Edison offered to invest $2 million in exchange for 25% ownership. The offer, which was subsequently revoked, was based on Edison's independent valuation of VTIC at $6 million.

Byelick filed this action on December 17, 1998. The Counts in the Amended Complaint can be summarized as follows:

Count I alleges that the Vivadellis and VTIC violated section 10(b) and Rule 10b–5 by making the 5 enumerated representations set forth, *supra*, and by omitting to disclose material facts which their duties required them to disclose. This count was previously dismissed as to S. Vivadelli by Order issued on September 29, 1999.

Count II alleges misrepresentations, omissions, and fraudulent devices in violation of the California Corporations Code. This count named the Vivadellis and VTIC as defendants, but was previously dismissed as to S. Vivadelli by Order issued on September 29, 1999.

Count III alleges that the same conduct alleged in Count I and II, violates an unspecified state's common law. Count III named the Vivadellis and VTIC as defendants, but was previously dismissed as to S. Vivadelli by Order issued June 7, 1999.

Count IV alleges breach of fiduciary duty, again without specifying the applicable law. The Vivadellis and VTIC are named as defendants.

Count V, alleging conspiracy and aiding and abetting, was previously dismissed without prejudice by Order issued June 7, 1999.

Count VI alleges breach of employment contract, naming only VTIC as defendant. VTIC admits that it breached the contract but disputes the amount of damages due as a result.

Byelick has moved for summary judgment on Counts I, IV and VI.

The defendants have moved for summary judgment on Counts I, II, III and IV.

## DISCUSSION

Rule 56(c), Fed.R.Civ.P., provides that summary judgment is to be rendered "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under subsection (e) of Rule 56:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

It is the responsibility of the party seeking summary judgment to inform the court of the basis for its motion, and to identify the parts of the record and affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Pocahontas Supreme Coal Co. v. Bethlehem Steel,* 828 F.2d 211, 216 (4th Cir.1987). Where the non-moving party bears "the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on 'the pleadings, depositions, answers to interrogatories and admissions' on file." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. The moving party may also use affidavits to support its motion. In either event, the non-moving party must go beyond the pleadings and, by citing its own affidavits or by citing " 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* Opposition to a properly documented summary judgment motion may not be based solely on the pleadings.

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is the function of the district court, not to weigh the evidence, but to determine whether there is a genuine issue for trial and "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511 (citations omitted). Hence, summary judgment is appropriate if the "evidence is merely colorable" or "is not significantly probative." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). The standard for summary judgment mirrors the standard for directed verdict (now judgment as a matter of law) under Rule 50(a), Fed. R.Civ.P., the *principal difference being procedural. Id.* at 251, 106 S.Ct. at 2511–12. And, "[w]here the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec-*

*tric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party, however, "need only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact for trial." *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 257, 106 S.Ct. at 2514–15. The district court also "must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513.

Furthermore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513; *McKinney v. Board of Trustees of Maryland Community College,* 955 F.2d 924, 928 (4th Cir. 1992). Summary judgment is appropriate only if, upon consideration of the record as a whole, a reasonable trier of fact could not find for the non-movant. *See Allstate Financial Corp. v. Financorp, Inc.,* 934 F.2d 55, 58 (4th Cir.1991). However, where a faithful examination of the record establishes the absence of a genuine issue of material fact, it is "the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987); *see also, Guinness PLC v. Ward,* 955 F.2d 875, 883 (4th Cir.1992).

These principles govern resolution of the motions for summary judgment.

## Count I: Federal Securities Fraud Claim Under Section 10(b) and Rule 10b–5

To prevail on a claim for violation of Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, a plaintiff must prove that: (1) the defendant made a statement of material fact that was false when made; (2) the defendant acted with scienter; (3) the plaintiff justifiably relied upon the defendant's false statements; and (4) the defendant's false statements proxi-

mately caused plaintiff's damages. *See Banca Cremi, S.A. v. Alex, Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir.1997).

At the initial hearing on these cross-motions for summary judgment, Byelick abandoned reliance on the five affirmative misrepresentations and instead pressed the alleged failure to disclose certain material information as the basis for his federal securities laws claim (as well as claims based on the California Corporation Code and common law misrepresentation). And, Byelick significantly restricted the allegedly non-disclosed material information. As currently postured by virtue of concessions made at oral argument and in briefs, Byelick's fraud-based claims devolve into (1) whether the allegedly non-disclosed information was disclosed, or if not, whether it was material and (2) whether the claims are barred by the statute of limitations.

▮ Therefore, as matters now stand, Byelick alleges material omissions respecting new software licences entered into after Byelick had left VTIC, about which Vivadelli did not inform Byelick, and which Vivadelli was allegedly duty-bound to disclose by virtue of his status as director of the corporation. To prevail on a securities fraud claim for material omissions under section 10(b), Byelick must show (1) an omission of material fact, (2) with scienter, (3) upon which Byelick justifiably relied, (4) that proximately caused Byelick's damages. *See Banca Cremi*, 132 F.3d at 1027; *see also Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260–61 (4th Cir.1993).

**A. Were There Material New Software Licenses About Which Vivadelli Did Not Inform Byelick and, if so, Was Vivadelli Under a Duty to Disclose Them?**

Byelick has been both slow and opaque in identifying and documenting the specific contracts on which he bases his claims of fraudulent non-disclosure. At oral argument on the cross-motions for summary

judgment, Byelick finally identified the assertedly relevant contracts only by referring to an invoice (Document V03402, Ex. 7 to Byelick's Mot. Partial Summ. J.) on which certain contract numbers and names are listed. We now know, however, that the contracts listed in the invoice are the contracts which Byelick asserts should have been disclosed, but were not. Vivadelli has presented a detailed explanation (Appendix A to Vivadellis' Surreply in Supp. Mot. Summ. J.) of the circumstances pertaining to every contract, eight in total, listed on the invoice.[2] Vivadelli has offered proof that, of these eight contracts, four (KMPG, Loral, MCI Boston, and MCI McLean) predate Byelick's departure (in 1995) by as much as ten months; one (Towers Perrin) relates to a contract dated December 31, 1995 which was canceled the following month; and one (Marriot) relates to a demonstration rather than to an actual software license. Also listed on the invoice is a $51,000 contract with Revenue Canada, about which Byelick admitted knowledge, and which nonetheless did not affect his decision to sell his stock. *See* Byelick Depo. at 144:11–25. Byelick has not contradicted that proof.

▮ That leaves one contract to be considered: a contract for $23,000 with First Union, which merely converted a trial relationship from November 1995 (when Byelick was still CFO) into a license. Thus, in reality, the only contract about which Byelick claims to have been misled is the $23,000 contract with First Union and Byelick knew about one version of that contract long before he sold his stock to Vivadelli. Vivadelli admits, however, that the conversion of the contract into a license was not disclosed to Byelick.

▮ Having isolated the sole, undisclosed contract, it is now necessary to assess whether the law imposed on Vivadelli a duty to disclose that contract. Insiders must disclose material facts known to them by virtue of their position, but which

---

**2.** The invoice contains 27 entries pertaining to eight contracts.

are not known to persons with whom they deal. *See Chiarella v. United States*, 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980). However, it is important to note that the law does not impose on an insider a duty to disclose every development in the business of the company. Thus, the duty to disclose arises only in situations which are material, that is, which are both extraordinary in nature and reasonably certain to have a substantial effect on the market price of the security if disclosed. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968). In other words, "[t]he basic test of materiality ... is whether a reasonable man would attach importance ... in determining his choice of action in the transaction in question." *Id.* at 849. Examples of events in the life of a corporation that are material and which an insider is duty-bound to disclose include "a contract to sell a company's assets, a several fold increase in basic inventory value, a rich ore strike, a plan by the buyers to sell shares at a much higher price, and large land installment land sales." Louis Loss & Joel Seligman, *Securities Regulations*, at 3498–99 (3d ed.1991) (internal citations omitted). Those examples are not exclusive, nor do they define the parameters of the disclosure obligation, but they serve adequately to outline the significance of that which must be disclosed.[3]

Considered in perspective of the legal parameters of the insider's disclosure duty, it cannot be said that the failure to disclose the conversion of the First Union contract to a license was a breach of that duty. In sum, the existence of an undisclosed contract in the amount of $23,000 is not material to Byelick's decision to sell his shares of stock, and therefore Vivadelli was under no duty to disclose the existence of the contract.

For the foregoing reasons, Defendant's motion for summary judgment is granted to the extent that Byelick relies on the failure to disclose the existence of any contracts listed in the invoice on which Byelick has relied to identify the contracts.

## B. Byelick Was On Inquiry Notice as of December 17, 1996 and Therefore Barred By the Statute of Limitations

Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings. *See Karsten v. Kaiser Found. Health Plan of the Mid–Atlantic States, Inc.*, 36 F.3d 8, 11 (4th Cir.1994); *Amato v. City of Richmond*, 875 F.Supp. 1124, 1139 (E.D.Va.1994). However, because the factual predicate of Byelick's federal securities claim is also relied upon to support his California statutory and Virginia common law claims, it is appropriate to address the Defendants' argument that the federal securities law claim is barred by the statute of limitations.

Byelick's complaint, filed more than two years after he was on inquiry notice of the non-disclosed fraud on which he bases his federal securities fraud claims, falls well outside the one-year statute of limitations governing actions under Section 10(b) and Rule 10b–5.[4] Hence, the defendants are entitled to summary judgment on Count I on that ground as well.

In *Lampf, Pleva, Lipkind, et al. v. Gilbertson*, 501 U.S. 350, 360, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court held that the statute of limitations governing actions under Section 10(b) is

---

**3.** For circumstances less extraordinary, the law imposes no duty to disclose, and, therefore, it is not surprising that a "relatively small number of nondisclosure cases that have survived defendants' motions for summary judgment ... to go to final judgment for the plaintiff on the merits." *Id.* at 3497.

**4.** Byelick's Amended Complaint raises the same claims as did his Complaint. Accordingly, Byelick's Complaint placed the Vivadellis' on notice of the claims contained in the Amended Complaint, and is therefore subject to the same statute of limitations. *See* Fed. R.Civ.P. 15(c).

one year after discovery of the fraud and within three years after the cause of action has accrued. In this circuit, that rule has been construed to mean that the statute of limitation begins to run when the alleged fraud "is discovered 'or should have been discovered by the exercise of due diligence.'" *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir.1993) (internal citations omitted).

■ The federal courts "have placed the burden of proof on the plaintiffs when questions of limitations arise under § 10(b) once the defendant has pleaded the statute of limitations." *Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir.1978); *see also General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 12 (1st Cir.1986); *Schaefer v. First National Bank*, 509 F.2d 1287, 1297 (7th Cir.1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1682, 48 L.Ed.2d 186 (1976); *Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir.1974); *Morgan v. Koch*, 419 F.2d 993 (7th Cir.1969); Louis Loss & Joel Seligman, *Fundamentals of Securities Regulations* 1121–22 (3d ed.1995). Applying that precept, the Fourth Circuit in *Surety Federal Savings & Loan Association v. Interstate Securities, Inc.*, upheld dismissal on summary judgment of plaintiff's securities fraud claims because of plaintiff's failure to carry its burden of proving that it exercised due diligence in discovering the fraud about which it complained. 846 F.2d 74, 1988 WL 45482, *2 (4th Cir.1988). Whether construed as an application of the doctrine of equitable tolling of a cause of action already accrued, *see Holmberg v. Armbrecht*, 327 U.S. 392, 395–97, 66 S.Ct. 582, 90 L.Ed. 743 (1946), or as the non-accrual of a cause of action by the absence of inquiry notice, *see Brumbaugh*, 985 F.2d at 162, the result is the same—the plaintiff bears the burden of proof on the statute of limitations issue. *Cf. Lukenas v. Bryce's Mountain Resort,*

*Inc.*, 538 F.2d 594 (4th Cir.1976) (placing limitations burden of proof on plaintiffs suing under Interstate Land Sales Full Disclosure Act); *Burton v. Terrell*, 368 F.Supp. 553, 558 (W.D.Va.1973)(granting summary judgment for defendant on state common law fraud claim because "plaintiffs have not established any act by defendant or anyone else, prior or subsequent to execution, which would have prevented the plaintiffs from discovering the true nature of the deed").

Accordingly, for Byelick to defeat summary judgment, he must show that, by the exercise of reasonable diligence, he could not have discovered the alleged fraudulent omissions on which he bases his federal securities fraud claim before December 17, 1997, one year before Byelick filed this action. Byelick's position is that he first knew that he had been "hoodwinked" after reviewing the 1995 and 1996 income statements and balance sheets given to him by Vivadelli on December 26, 1997, and reviewed by Byelick in January 1998. *See* Byelick Depo. 260:5–8. Based on the record, however, Byelick reasonably could have discovered the fraud of which he complains long before December 1997. Byelick—a director of VTIC until March 13, 1996, and one of two shareholders after that time—had access to the relevant information by asking for it. Indeed, Byelick was entitled to that information, and he knew that he was so entitled, as indicated by his letter dated July 7, 1998 invoking his right to access information.[5] According to Byelick, his repeated requests for financial information met with no response for over two years.

Under *Brumbaugh*, "[i]nquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam." 985 F.2d at 162. Vivadelli's repeated failures to respond to Byelick's repeated telephonic requests for in-

---

5. Byelick's letter through counsel states: "[P]lease accept this letter as Mr. Byelick's formal notice and demand to inspect the books and records of the corporation pursu-

ant to Section 13.1–771, Code of Virginia (1950) and other relevant provisions of Virginia law ...."

formation put Byelick on inquiry notice of the alleged non-disclosure of material information generally because Byelick clearly considered the information material and he knew that Vivadelli steadfastly refused to disclose it.

Most damaging to the securities fraud claim is Byelick's deposition testimony, which reveals his *actual* concern as of May 17, 1996 over Vivadelli's alleged failure to provide financial information. *See* Byelick Depo. at 193:10–11 ("it's very, it's concerning to me that we can't get financials out and you have got this accountant, why can't we get the stuff done."); *id.* at 40:10–11 ("To wait till December 26th, 1997 to receive '95 and '96 statements was quite concerning."). In fact, Byelick testifies to having unsuccessfully requested financial documents at least a dozen times by December 2, 1996. *See* Byelick Int. Ans. 10. And, by December, 1997, Byelick admits that he had requested financial statements for almost two years in some twenty to forty conversations with Vivadelli. *See* Compl. ¶ 27; Byelick Depo. 63:8–13, 65:21–66:3. The record also reflects that, in March 1996, Byelick suspected that Vivadelli had provided an "untrue" notice of a directors' meeting, and that Byelick had sought legal advice in connection with that discovery. *See* Byelick Depo. 106:15–107:10; 124:1–8.

Byelick's claims that Vivadelli was issuing doomsday statements about the fiscal health of VTIC were refuted by facts known to Byelick which contradicted a negative prognosis for the company. Therefore, the issuance of the negative statements would underscore the notice provided by the repeatedly requested, but never provided, financial statements. For example, Byelick knew that VTIC had paid the salaries of two full-time employees throughout 1996, see Byelick Depo. 291:19–292:12; that VTIC continued to earn revenue from its consulting business, see *id.* at 160:2–3, 299:15–19; that VTIC continued to earn revenue from software licensing, see *id.* at 11:9–18, 12:5–15; that

in the summer of 1996, VTIC had moved its place of operations out of Vivadelli's house and into a leased office facility, see *id.* at 255:12–13; and that VTIC was still a viable company in 1997 because even Byelick was promoting VTIC to potential customers, see *id.* at 486:1–487:11.

Byelick also asserts that Vivadelli "stalled" him by falsely claiming to be working on financial statements. There is simply no support in the record for that contention. To the contrary, Byelick testified that, in approximately September 1996, Vivadelli told him that the company was capable of generating financial statements, and had completed the 1995 financial statements in July of 1996. *See* Byelick Depo. at 248. Because Byelick knew that the corporation could produce financial statements, he was on inquiry notice of the frauds of which he now complains when Vivadelli consistently failed to give him the 1995 and 1996 financials after repeatedly being requested to do so.

The foregoing, undisputed facts establish that Byelick had at least as much inquiry notice as that which, in other cases, has been held to put plaintiffs on notice under the federal securities laws. *See, e.g., Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1168–69 (7th Cir.1995)(holding plaintiff on notice where plaintiff had representatives on the company's board of directors); *Hernandez v. Childers*, 736 F.Supp. 903, 908–09 (N.D.Ill.1990)(holding plaintiff on notice where defendant ignored the first request for documents relating to a plaintiff's investment); *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 13 (1st Cir.1986)(holding plaintiff on notice where plaintiff had contractual right to review financial records at issue, but relied solely on the representations of the defendant); *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 129 F.3d 222 (1st Cir.1997)(holding plaintiff on notice where defendant failed to provide plaintiff with a promised prospectus).

Finally, given the allegedly contradictory signals which he claims to have received from Vivadelli, Byelick had an obligation to investigate the omissions on which he predicates this action. Thus, reasonable diligence would require Byelick to have confronted Vivadelli with the mounting evidence, which tended to contradict the latter's doomsday prognostications for the company. Beyond these failures to investigate Vivadelli's put-offs, Byelick's inquiry should have been directed elsewhere, for, as the *Cooperativa* court admonished, "even an investor of ordinary judgment and experience can discern that there is some risk in limiting inquiry to the very broker who may have misled or even defrauded the investor." 129 F.3d at 225. Although it may be true that Byelick could not have turned to others than Vivadelli within the company for the financial information he sought, see Vivadelli Depo. at 204, the dispositive point here is that Byelick was on inquiry notice of the prudence of acting affirmatively to secure the information which he knew to be important even if that meant legal action to timely protect his rights as a shareholder. As explained in *Brumbaugh*, "[f]aced with numerous warnings of an investment's potential risk, the investor simply cannot wait to see if those risks materialize before bringing suit." 985 F.2d at 163. Based on the record, that is precisely what this investor did.

In conclusion, Byelick should have discovered the fraud of which he now complains by September 13, 1996 at the latest because he had unsuccessfully requested financial documents from Vivadelli at least a dozen times by this date and he allegedly had received negative information which

he knew to have been incorrect. *See* Byelick Int. Ans. 10 (documenting phone conversations between Byelick and Vivadelli). Under the rule of *Brumbaugh,* 985 F.2d at 162, these facts are sufficient to have placed Byelick on inquiry notice as of September 13, 1996.[6] Because Byelick did not file suit until December 17, 1998, his federal securities fraud claim is barred by the statute of limitations. Accordingly, Vivadelli's motion for summary judgment is granted as to Count I.

## Count II: Byelick is Barred By the Statute of Limitations From Pursuing His California Corporations Code Fraud Claim

Vivadelli also asserts that Count II is barred by the one-year statute of limitations in the California Corporate Code. It provides that:

No action shall be maintained to enforce any liability created under Section 25500, 25501, or 25502 (or Section 25504 or Section 25504.1 insofar as they related to those sections) unless brought before the expiration of four years after the act or transaction constituting the violation or the expiration of *one year after the discovery by the plaintiff of the facts constituting the violation,* whichever shall first expire.

Cal. Corp.Code § 25506 (West 1999). Byelick asserts that § 25506 does not on its face refer to "inquiry notice" and hence that the statute of limitations under the California Corporations Code is triggered only by actual notice. Although Byelick is correct that the statute does not mention inquiry notice as the activating event of the statute of limitations, his argument is

6. September 13, 1996 is also the date of the contract between Byelick and Vivadelli, and therefore the date of Byelick's reliance on the alleged omissions of Vivadelli. At the September 29, 1999 hearing on these motions, the Court determined that the effective date of the contract for sale of shares by Byelick to Vivadelli should be date of delivery of the stock certificates, September 13, 1996. The Court based its conclusion on the parties'

disagreement over the consideration for transfer of the 900 shares, particularly whether the contract called for Vivadelli to "indemnify" or to "release" Byelick. *See* Tr. Hr'g September 29, 1999 at 111–116. Tr. Hr'g September 29, 1999 at 111–16 ("But during that period of time, there was a dispute about what the consideration was."). Once Byelick tendered the stock, the agreement was ratified. *Id.* at 115.

nonetheless without merit. The Ninth Circuit has held that

> [t]he limitations period under 15 U.S.C. § 77m does not begin to run until plaintiff discovers the facts constituting the violation *or in the exercise of reasonable diligence should have discovered them* .... The same principle applies under Cal.Corp.Code § 338(4), *Turner v. Lundquist*, 377 F.2d 44, 46, 47 (9th Cir. 1967), and, in view of the similarity in language, *we think also under Cal.Corp. Code § 25506.*

*Kramas v. Security Gas & Oil*, 672 F.2d 766, 770 (9th Cir.1982) (emphasis added). That remains the controlling interpretation.

Count II is therefore subject to the same inquiry notice analysis as that which necessitates dismissal of Count I. Accordingly, summary judgment is granted in favor of Vivadelli on Count II.

## Count III: Byelick's Claim For Virginia Common Law Fraud is Barred By the Statute of Limitations

In Virginia, common law fraud claims are subject to a two year statute of limitations, counted from the time the plaintiff is placed on inquiry notice. *See* Va.Code Ann. §§ 8.01–243, –249 (1999). The issue, therefore, is whether Byelick was on inquiry notice over two years before filing the action. That is, was Byelick on inquiry notice of the alleged fraudulent misrepresentations and omissions as of December 16, 1996.

Although the Virginia statute of limitations is one year longer than the applicable federal or California statute, the outcome is not affected by that difference because the events relied upon to support the grant of summary judgment in favor of Vivadelli on the federal and California claims generally took place in 1996. As discussed in part I, *supra*, those events placed Byelick on inquiry notice by September 13, 1996.

Therefore, Vivadelli is entitled to summary judgment on Count III.

## Count IV: Breach of Fiduciary Duty Claim

Byelick's breach of fiduciary duty claim arises out of two specific actions taken by VTIC's Board of Directors: (a) the Consent of the Board given on May 22, 1996 to the waiver of the corporation's right of first refusal to purchase Byelick's stock before Vivadelli or anyone else could do so; and (b) the Consent of the Board given on December 30, 1996 to the sale by the corporation to John Vivadelli of an additional 50,000 shares of VTIC stock, the effect of which was to reduce Byelick's ownership interest from 10% to less than 1%. Each predicate for the breach of fiduciary duty claim will be considered in turn.

### A. The May 22, 1996 Waiver of the Corporation's Right of First Refusal

Byelick claims that the Vivadellis breached their fiduciary duty by causing the Consent of the Board of Directors on May 22, 1996, which waived the corporation's right of first refusal to purchase Byelick's stock before Vivadelli (or, for that matter, anyone else) could purchase it. In Byelick's view, the act of causing the corporate waiver was a conflict of interest because it permitted Vivadelli to purchase Byelick's stock.

This theory fails for lack of a statutory predicate. Specifically, the statute under which Byelick claims relief, § 13.1–691 of the Virginia Corporations Code, defines a "conflict of interests" transaction as a "transaction *with the corporation* in which a director of the corporation has a direct or indirect personal interest." Here, there was no transaction "with the corporation," because Byelick's stock sale was to Vivadelli in his capacity as a private individual.[7]

---

7. To the extent that Byelick's breach of fiduciary duty relies on the Vivadellis' failure to disclose material information, that claim is really one of fraud; and, as discussed, Byelick's fraud claims are time barred.

For that reason, the Vivadellis' motion for summary judgment is granted on Byelick's claim for breach of fiduciary duty relating to VTIC's waiver of its repurchase rights to Byelick's sale of stock to Vivadelli.

### B. The December 30, 1996 Dilutive Sale of Shares To Vivadelli

Byelick also claims that the December 30, 1996 issuance of 50,000 shares, and the sale of those shares to Vivadelli, breached the fiduciary duty owed to Byelick, as a shareholder, by Vivadelli and Stephany Vivadelli. This claim raises several legal questions.

#### 1. The Virginia Law of Fiduciary Duty

It is well-settled that "[a] Virginia corporation's directors and officers owe a duty of loyalty both to the corporation and to the corporation's shareholders." *WLR Foods v. Tyson Foods, Inc.*, 869 F.Supp. 419, 421 (W.D.Va.1994); *Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69, 74 (1984); *Adelman v. Conotti Corp.*, 215 Va. 782, 213 S.E.2d 774, 779 (1975). Moreover, "a director of a private corporation cannot directly or indirectly, in any transaction in which he is under a duty to guard the interests of the corporation, acquire any personal advantage, or make any profit for himself, and if he does so, he may be compelled to account therefor to the corporation." *Rowland v. Kable*, 174 Va. 343, 6 S.E.2d 633, 642 (1940). Although in *Rowland*, the fiduciary duty at issue was one that was owed to the corporation, the Supreme Court of Virginia has affirmed that the same sort of duty "applies to the conduct of the officers and directors of a corporation *in their dealings with the corporation's stockholders.*" *Adelman*, 215 Va. 782, 790, 213 S.E.2d 774, 779 (emphasis added); *see also WLR Foods, Inc. v. Tyson Foods, Inc.*, 869 F.Supp. 419, 421 (W.D.Va.1994) ("[a] Virginia corporation's directors and officers owe a duty of loyalty both to the corporation and to the corporation's shareholders."); *Glass v. Glass*, 228 Va. 39, 321 S.E.2d 69, 74 (1984) ("[c]orporate officers and directors have a fiduciary duty in their dealings with shareholders and must exercise good faith in such dealings.")

Somewhat less settled in Virginia is whether a director is liable to an individual shareholder for a breach of this fiduciary duty. When confronted with uncertain state law, a federal court, sitting in diversity jurisdiction, must predict what course the highest court in the state would take. The federal court may base its prediction on "canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions." *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir.1999); *see also Johnson v. Teal*, 769 F.Supp. 947, 949 (E.D.Va.1991). Equally appropriate for the Court's consideration are law review articles on the subject. *See State Farm Fire & Cas. Co. v. Fullerton*, 118 F.3d 374, 378 (5th Cir.1997). Finally, cases from other jurisdictions can also provide guidance. *See Warren Bros. Co. v. Cardi Corp.*, 471 F.2d 1304, 1307–08 (1st Cir.1973).

The Vivadellis cite *American General Insurance Company v. Equitable General Corporation, et al.*, 493 F.Supp. 721 (E.D.Va.1980) for the proposition that a director's fiduciary duty runs to the shareholders as a class, and, on that basis, the Vivadellis contend that an individual shareholder cannot sue a director for breach of fiduciary duty in a direct action. In *American General*, the court held that the common law duty owed to the shareholders by the directors in *Adelman* "was not a fiduciary duty inuring to each shareholder in his individual dealings with [the corporation], but was rather a duty attaching only to dealings between the officers and directors of [the corporation] and the shareholders as a class." 493 F.Supp. at 741; *see also* 1 William E. Knepper & Dan A. Bailey, *Liability of Corporate Officers and Directors* § 1–7 (internal citations

omitted)("Even as to the fiduciary duty owed to shareholders, there are some limitations. The duty is owed to all shareholders as a group, not to individual shareholders.") Thus, *American General* would appear to foreclose the direct action by Byelick.

However, Byelick's case is distinguishable because the entities in *American General* and *Adelman* were large, publicly traded corporations with many shareholders, whereas VTIC is a closely held corporation whose only shareholder, other than the allegedly conflicted board member, was Byelick.[8] Although a shareholder challenging an action of the directors of a publicly held corporation is typically required to sue in a derivative capacity, see, for example, Va.Code Ann. § 13.1–672.1, closely-held corporations raise a different set of concerns.

In *Donahue v. Rodd Electrotype Company of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505 (1975), the Supreme Judicial Court of Massachusetts addressed these unique concerns in the context of a minority shareholder's suit against, *inter alia*, the directors and the former director, officer, and controlling shareholder of a closely held corporation. The court first recognized that the close corporation—because it is typified by a small number of stockholders, a limited market for the stock, and significant majority stockholder participation in management—"is often little more than an 'incorporated' or 'char-

tered' partnership." 328 N.E.2d at 511–12. Because the close corporation functions much like a small partnership, "the relationship among the stockholders must be one of trust, confidence and absolute loyalty if the enterprise is to succeed." *Id.* at 512. And, because the minority shareholder in a close corporation is generally incapable of authorizing dissolution, yet cannot reclaim his capital because there is rarely a market for his shares, minority shareholders are easily "trapped in a disadvantageous situation" and subjected to "freeze-out" schemes by majority shareholders seeking to acquire their shares for inadequate prices. *Id.* at 514–15. The Supreme Judicial Court of Massachusetts concluded:

> Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another.

*Id.* at 515. Accordingly, the minority shareholder in *Donahue* was accorded the right to sue individually. This view has found acceptance in numerous jurisdictions.[9] Notably, the American Law Institute has incorporated the views articulated

---

**8.** At the times relevant to this litigation, VTIC was owned by two shareholders: Byelick and John Vivadelli. The directors were Vivadelli and his wife, Stephany Vivadelli.

**9.** *See, e.g., Southern Pac. Co. v. Bogert,* 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 (1919); *McDaniel v. Painter,* 418 F.2d 545 (10th Cir. 1969); *Watson v. Button,* 235 F.2d 235 (9th Cir.1956); *Perlman v. Feldmann,* 219 F.2d 173 (2d Cir.), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955); *Wilson v. Wilson–Cook Med., Inc.,* 720 F.Supp. 533, 537 (M.D.N.C.1989); *Guy v. Duff & Phelps, Inc.,* 672 F.Supp. 1086, 1090 (N.D.Ill.1987); *Orchard v. Covelli,* 590 F.Supp. 1548, 1556–59 (W.D.Pa.1984); *Burt v. Burt Boiler Works, Inc.,* 360 So.2d 327 (Ala.1978); *Alaska Plas-*

*tics, Inc. v. Coppock,* 621 P.2d 270 (Alaska 1980); *Jones v. H.F. Ahmanson & Co.,* 1 Cal.3d 93, 460 P.2d 464, 81 Cal.Rptr. 592 (1969); *Singer v. Magnavox Co.,* 380 A.2d 969 (Del.1977); *Doherty v. Kahn,* 289 Ill.App.3d 544, 224 Ill.Dec. 602, 682 N.E.2d 163 (1997); *W & W Equip. Co. v. Mink,* 568 N.E.2d 564, 574 (Ind.Ct.App.1991); *Donahue v. Rodd Electrotype Co. of New England,* 367 Mass. 578, 328 N.E.2d 505 (1975); *Evans v. Blesi,* 345 N.W.2d 775, 779 (Minn.Ct.App.1984); *Fought v. Morris,* 543 So.2d 167, 170–71 (Miss.1989); *Crosby v. Beam,* 47 Ohio St.3d 105, 548 N.E.2d 217, 220 (1989); *A. Teixeira and Co., Inc. v. Teixeira,* 699 A.2d 1383 (R.I. 1997).

in *Donahue* and the related cases in its recommendations respecting corporate governance:

> § 7.01(d) In the case of a closely held corporation [§ 1.06], the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

A.L.I., *Principles of Corporate Governance: Analysis and Recommendations,* § 7.01(d)(1994). The view has been exhaustively articulated in treatises and law review articles. *See, e.g.,* 18A AM. JUR. 2D CORP. § 732 (1985)(discussing similarity between close corporation and partnership and recognizing that many courts have applied fiduciary duties of the latter to the former); Knepper & Bailey, *supra,* at 37 ("Close corporations are particularly susceptible to misuse or abuse of minority shareholders by majority shareholders. Accordingly, at least in some jurisdictions, controlling shareholders in close corporations owe fiduciary duties to minority shareholders."); Randall K. Justice, *The Duty of Corporate Directors to Pay Dividends,* 87 Ky. L.J. 231, 249–50 (1999)(discussing fiduciary duties in the close corporation); Douglas K. Moll, *Shareholder Oppression v. Employment at Will in the Close Corporation: The Investment Model Solution,* 99 U. Ill. L.Rev. 517 (1999)(same); James M. Van Vliet Jr. and Mark D. Snider, *The Evolving Fiduciary Duty Solution for Shareholders Caught in a Closely Held Corporation Trap,* 18 N. Ill. U.L.Rev. 239, 250–51 (1998)(same). Finally, the Model Business Corporations Act reflects the development of this view. *See* 1 Model Bus. Corp. Act Ann. 254 (W.

Scott 2d ed.1971) ("[m]inority shareholders are protected from abuse [where the shares of particular shareholders only are purchased] by traditional common law principles of fraud and the fiduciary obligation of management and controlling stockholders to the minority").

 Although the issue does not appear to have been decided in Virginia, it appears that the same principles would find acceptance by the Supreme Court of Virginia. In *Glass v. Glass,* 228 Va. 39, 321 S.E.2d 69 (1984), the Court considered an action by minority shareholders of a closely held corporation alleging conspiracy by majority shareholder directors to prevent the minority shareholders from selling their stock at a fair price. In *Glass,* the Court, construing plaintiff's conspiracy claim to allege, *inter alia,* a breach of fiduciary duty, cited the now familiar language from *Adelman* [10] before concluding that the plaintiffs had failed to establish that defendants had acted in concert. Thus, although the Supreme Court of Virginia dismissed the conspiracy charge in *Glass* for failure to state a claim, it did so on a set of pleaded facts far different than the facts presented by this action, not because the law foreclosed such claims in all circumstances.

Considering *Glass* and *Adelman* and the other available and appropriate resources on the topic, it is reasonable to conclude that, if faced with the question whether a minority shareholder of a closely held corporation has a cognizable claim against an inside director for breach of fiduciary duty in respect of a corporate transaction which benefits the inside director, the Supreme Court of Virginia would hold in the affirmative, particularly where, as here, there is only one minority shareholder.

## 2. How Can Byelick Challenge a Dilution of Stock by the Board of the Corporation?

 Having concluded that a minority shareholder of a closely held corporation

---

**10.** "Corporate officers and directors have a fiduciary duty in their dealings with shareholders and must exercise good faith in such dealings." 228 Va. at 47, 321 S.E.2d at 74 (*citing Adelman v. Conotti Corp.,* 215 Va. 782, 790, 213 S.E.2d 774, 779 (1975)).

can sue a director/majority shareholder for breach of fiduciary duty in respect of a transaction benefitting the inside director, it is now necessary to assess the substance of Byelick's claim that the December 30, 1996 dilutive sale to Vivadelli constituted such a breach. Before undertaking that task, however, it is necessary to consider an argument asserted repeatedly by the Vivadellis respecting the dilutive transaction.

The Vivadellis characterize Byelick's breach of fiduciary duty claim as an attempt to gain preemptive rights, which rights, according to the Vivadellis, were lawfully eliminated on December 2, 1996 by a properly conducted board meeting. The Vivadellis then argue that "[a]ny right a shareholder has to avoid dilution *must* be based on [§ 13.1–651, governing] preemptive rights, and Byelick had no preemptive rights." Def.'s Surreply in Supp. Mot. Summ. J. at 3 (emphasis added). In pressing this position, the Vivadellis argue that to permit Byelick to proceed here would require creation of "an entirely new right and a new cause of action," in disregard of "the only exception to the Virginia Code section that governs preemptive rights, Va.Code. Ann. § 13.1–651." *Id.* at 4.

The Vivadellis' argument is misplaced. First, although they assert that the argument is "unshakeable as a matter of law [and] more than fair as a matter of equity," the Vivadellis cite absolutely no authority for the proposition that Byelick's sole remedy for the allegedly improper dilution presented by the facts of this action is provided by § 13.1–651. That section provides, in pertinent part, that:

Unless limited or denied in the articles of incorporation ... the shareholders of a corporation have a preemptive right, granted on uniform terms and conditions prescribed by the board of directors to provide a fair and reasonable opportunity to exercise the right, to acquire proportional amounts of the corporation's unissued shares upon the decision of the board of directors to issue them.

The Vivadellis argue that, because preemptive rights were "limited or denied in the amendment to the articles of incorporation" effected pursuant to the Consent of the Board of Directors of December 2, 1999, Byelick has no legal right to challenge the dilution of his interest in VTIC.

In effect, the Vivadellis read § 13.1–651 to preempt all other law, statutory or decisional, bearing on the dilution of interests in a corporation—including the law that a director owes a fiduciary duty to a corporation's shareholders. Nothing in the text of Section 13.1–651 suggests that the statute was intended to swallow whole the Virginia common law respecting the duty of a fiduciary. Nor would such an interpretation be consistent with the general principles controlling the elimination of preemptive rights. In that respect, a leading treatise explains the requirements for a lawful amendment of a corporation's articles of incorporation to eliminate preemptive rights:

If preemptive rights exist in a particular corporation, their elimination by amendment of the articles of incorporation is possible if such amendment is authorized by the laws of the jurisdiction of incorporation, *no violation of fiduciary duties is involved*, and procedures required to effectuate such amendment are allowed.

Harry G. Henn & John R. Alexander, *Laws of Corporations*, 444 (1983)(emphasis added). Indeed, even where preemptive rights are not provided to shareholders in the articles of incorporation, a director's fiduciary duty nonetheless constrains the issuance of shares:

Whether or not preemptive rights are elected, however, the director's fiduciary duty extends to the issuance of shares. Issuance of shares at favorable prices to directors (but excluding other shareholders) or the issuance of shares on a nonproportional basis for the purpose of

affecting control rather than raising capital may violate that duty.

1 Model Bus. Corp. Act Ann., 6–168 (1997 Supp.).

The Vivadellis' error of law is equally visible in the backwards assertion that "Byelick never suggests why the concepts of fiduciary duty or interested party provide him with some kind of common law preemptive rights . . . ." In fact, Byelick never made such an assertion. Quite to the contrary, Byelick's contention is that the common law of fiduciaries prohibits the Vivadellis from amending the articles of incorporation to eliminate preemptive rights in derogation of their fiduciary duty (as they allegedly did on December 2, 1999), and then, barely a month later, approving (by Consent of the Board of Directors of December 30, 1996) the sale by VTIC to John Vivadelli of an additional 50,000 shares, which reduced Byelick's ownership interest from 10% to less than 1%, again, allegedly in violation of his fiduciary duty.

The Vivadellis' argument would give the statute on which it is based an effect not apparent on the face of the statute by eviscerating Virginia's common law respecting the fiduciary duties of directors. That can be done, of course, but only in clear terms not yet used by Virginia's legislature or her courts.

Having concluded that a dilutive transaction can be challenged under the Virginia common law of fiduciaries, it becomes necessary to ascertain how an individual shareholder can seek redress by reference to this law.

### 3. Virginia Law of Interested Director Transactions

Two sections of the Virginia Corporations Code bear on Byelick's claim that the December 30, 1996 dilutive transaction breached the Vivadellis' fiduciary duty to Byelick. Respecting the fiduciary duty owed by a director of a corporation, the Virginia Code provides that a director "shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his *good faith business judgment of the best interests of the corporation.*" Va.Code. Ann. § 13.1–690 (emphasis added). In so discharging his duties, a director is entitled to rely on the advice of certain others, including professionals and legal counsel, provided that the director has no reason to suspect that such reliance is unwarranted. Section 13.1–690C provides that "[a] director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section." Finally, § 13.1–690D allocates the burden of proving a violation of this section on the party alleging the violation.

In defining conflicts of interest by directors, the Virginia Code provides in pertinent part that:

A. A conflict of interests transaction is a transaction with the corporation in which a director of the corporation has a *direct or indirect personal interest.* A conflict of interests transaction *is not voidable by the corporation solely* because of the director's interest in the transaction if any one of the following is true:

1. The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors and the board of directors or committee authorized, approved, or ratified the transaction;

2. The material facts of the transaction and the director's interest were disclosed to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or

3. *The transaction is fair to the corporation.*

Va.Code Ann. § 13.1–691 (emphasis added).

At the time of the December 30, 1996 dilutive transaction, the Board was comprised of only two directors. It is not

contested that one of these directors, John Vivadelli, was an "interested director" because he had a direct or indirect personal interest in the outcome of the transactions. The defendants argue that § 13.1–691 affords no remedy to an individual shareholder. Their argument is based on the language of § 13.1–691, which provides that "[a] conflict of interests transaction is not voidable *by the corporation* solely because of the director's interest in the transaction if any one of the following is true . . . ." Thus, according to the Vivadellis, § 13.1–691 does not create a personal right of action by an individual minority shareholder; rather, the right of action exists only *in the corporation.*

A plain reading of § 13.1–691 supports the Vivadellis' position that the statute refers to a *corporation's* (and not a shareholder's) right to void an interested director transaction. And, the corporation could void an interested director transaction by way of a derivative suit brought on its behalf by a shareholder. Nevertheless, having recognized that VTIC is a closely held corporation, and having explored the special fiduciary duties attaching to the majority shareholders of a close corporation, it remains to be decided whether the plain language of § 13.1–691 reasonably can be read to permit the claim of a minority shareholder against a transaction entered into by an interested director of a close corporation.

Some teaching on this point is provided in the legislative history of the predecessor to current § 13.1–691, which is § 13.1–39.1. That provision was "not intended . . . to displace totally the former common law rules, but only to amend it to the extent set forth in the statute." Stephen R. Larson, *Corporate Conflicts of Interest Under the Virginia Stock Corporation Act,* 9 U. Rich. L.Rev. 463, 465 (1975).

Also instructive in the context of this case is *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 2766, 115 L.Ed.2d 929 (1991), in which the Su-

preme Court of the United States assumed that a shareholder could potentially void an interested director transaction under § 13.1–691. In *Sandberg,* the Court interpreted that section to "bar[ ] a *shareholder* from seeking to avoid a transaction tainted by a director's conflict *if, inter alia,* the minority shareholders ratified the transaction following disclosure of the material facts of the transaction and the conflict." *Id.* at 2766 (emphasis added). The corollary to such an interpretation, of course, is that, if none of the three savings provisions in § 13.1–691 were satisfied, then a minority shareholder could challenge an interested director transaction.

Considered in perspective of the fiduciary duties in a closely held corporation, the legislative history of the Virginia statute bearing on interested director transactions, and the Supreme Court dictum in *Virginia Bankshares,* it would seem that in Virginia, a shareholder can challenge an interested director transaction in a close corporation under § 13.1–691.

By its plain text, however, § 13.1–691 is a statute which regulates conflict of interest transactions. It does not address the potential liability of a director who has a conflict of interest.[11] The liability of a director with a conflict of interest is controlled by § 13.1–690. Therefore, to the extent that Byelick seeks to hold the Vivadellis liable on the interested director transaction involving the issuance of 50,000 shares in December of 1996 and their sale to Vivadelli, Byelick must proceed under § 13.1–690; and, to the extent that Byelick seeks to void the interested director transaction, Byelick must proceed under § 13.1–691.

**4. If a Shareholder Sues Under § 13.1–691, What Must an Interested Director Show To Cleanse the Transaction?**

▇▇▇ Having concluded that Byelick is permitted to challenge the December 30,

---

**11.** *See* Allen C. Goolsby, Virginia Corporation Law and Practice § 9.8 (Supp.1997).

1995 dilutive transaction under § 13.1–691 in his status as shareholder, it is now time to determine the circumstances under which an interested director can defeat a claim of impropriety. As the Vivadellis concede, savings provisions (1) and (2) are plainly inapplicable because Vivadelli's vote is discounted by virtue of his interest in the transaction. *See* Va.Code. Ann. § 13.1–691 C & D. Although it has been Byelick's contention that the challenged transactions were not, and could not possibly have been, approved by a majority of disinterested directors or shareholders—which is how an interested director transaction is cleansed under § 13.1–691A(1) & (2), respectively—that fact alone does not entitle him to relief under Virginia law.

There is a third savings provision, the existence of which Byelick persistently has refused to acknowledge. The third savings provision in § 13.1–691 cleanses an interested director transaction on a showing that the "transaction was fair to the corporation."

■ Once an interested director transaction is established, the burden of proof shifts to the defendant (interested director) to show that his actions complied with the requirements of § 13.1–691. *See Izadpanah v. Boeing Joint Venture*, 243 Va. 81, 412 S.E.2d 708 (1992). Thus, the Vivadellis bear the burden of showing that the transaction at issue was fair to the corporation.[12]

■ No inflexible rule has been established by which to test the "fairness" of a transaction. *See Willard v. Moneta Building Supply Inc.*, 258 Va. 140, 515 S.E.2d 277, 287 (1999). It depends largely on the nature and circumstances of the

business action, but, generally, a director must act in good faith, and the transaction must, "as a whole, [be] open, fair and honest at the time it was consummated." *Deford v. Ballentine Realty Corp.*, 164 Va. 436, 449, 180 S.E. 164, 169 (1935); *accord Adelman v. Conotti Corp.*, 215 Va. 782, 789–90, 213 S.E.2d 774, 779 (1975). In sum, "a transaction in which a director has a conflict of interests should bear 'the earmarks of an arm's length bargain' in order to be deemed 'fair to the corporation'" under § 13.1–691(A)(3). *Moneta*, 515 S.E.2d at 287. This is the showing required of the Vivadellis, and the burden of proof is on them to make it.

In the context of this action, the burden is on the Vivadellis to show: (1) the fairness to the corporation of the Consent of the Board of Directors of December 30, 1996, approving the sale by VTIC to John Vivadelli of an additional 50,000 shares, as well as (2) the fairness of the actual sale itself. This is a disputed issue of material fact, and therefore cannot be decided on summary judgment. Accordingly, the motions for summary judgment on Count IV filed by both Byelick and the Vivadellis must be denied, and the issue must be decided at trial.

### 5. Alternatively, if a Shareholder Sues Under § 13.1–690, What Must the Shareholder Show?

Section 13.1–691 does not address the liability of a director upon a successful challenge to his interested director transaction; as discussed previously, the director's liability is circumscribed by § 13.1–690, which codifies the business judgment rule. To the extent that Byelick seeks to hold the Vivadellis personally liable for the December 30, 1995 dilutive

12. In *WLR Foods, Inc. v. Tyson Foods,* 155 F.R.D. 142, 144–45 (W.D.Va.1994), the court explained that, in judging fairness to the corporation, the substance of professional advice given to and relied upon by a defendant is immaterial because:

[s]uch advice is not probative of what the conflict was, whether there was disclosure of the conflict, whether the board or share-

holders adopted or ratified the directors' action despite the known conflict or whether the transaction was fair to the corporation.... Furthermore, the advice provided by legal and financial consultants is not probative of how fair the director's action was to the corporation, as fairness must be established irrespective of advice sought or given.

transaction, he must proceed under § 13.1–690.

### Count VI: Byelick's Motion for Summary Judgment On Count VI For Breach of Employment Contract is Granted

VTIC has admitted liability on Byelick's employment contract with VTIC, leaving only the issue of damages to be resolved at trial. Accordingly, Byelick's motion for summary judgment on the breach of employment contract claim is granted. The damages must be established at trial.

### CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment on Counts I, II and III is granted and those Counts are dismissed with prejudice; the Defendants' motion for summary judgment on Count IV is denied; the Plaintiffs' motion for summary judgment is denied on all counts except as to Count VI as to which summary judgment is granted on the issue of liability.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.